### JOSEPH LAVETTE *vs.* CHARLES H. SAGE.

Upon a bill in chancery to set aside a conveyance claimed to have been fraudulently obtained by the respondent from the petitioner, a committee to whom the case was referred found that the property conveyed was an estate which fell to the petitioner by the death of his sister and was of the value of $7,000—that the petitioner had long been grossly intemperate and that his mind was greatly enfeebled in consequence—that he was unacquainted with business except of the simplest kind—that he did not know of his sister's death until he was informed of it by the respondent, who had sought him out for the purpose of obtaining the conveyance, and that he was wholly ignorant as to the character and value of the estate which she left—that the respondent, who was aware of his ignorance on the subject, did not inform him fully or correctly as to the amount of the property, but suppressed certain important facts, and excited his fears lest he should lose the whole by the contesting of a certain will under which his sister had received the property, when he had no reason to expect that the will would be contested—and that by these means the respondent procured a conveyance of the estate from the petitioner for $1,000, of which $300 only was paid in cash and the rest in the notes of the respondent, who was a bankrupt, but which notes the respondent afterwards offered to pay. The committee however found no *actual fraud* on the part of the respondent, and *no fraud unless the law would infer it from the facts found.* The superior court, on these facts, passed a decree setting aside the conveyance. Held, on a motion in error from this decree, that the conveyance, on these facts, was properly set aside.

Where fraud is an inference of law from certain facts, it is not necessary that a court of equity in passing its decree should in terms find the fraud, but it is enough if the court finds the facts. The passing of the decree is a sufficient application of the law to the facts.

It is otherwise where the fraud depends upon motives and intents. In this case the fraud is actual, and must be found specifically.

An acceptance of the report of a committee in chancery is a sufficient finding of the facts reported.

See remarks of Storrs, C. J., made in the course of the argument, as to the distinction between fraud in law and fraud in fact,—*page* 688.

BILL IN EQUITY, to set aside a conveyance claimed to have been fraudulently obtained from the petitioner by the respondent. The case was referred to a committee, whose report embraced the following facts.

The petitioner was the brother and sole heir at law of Julia Goodspeed, who died intestate on the 18th of September, 1859, leaving real and personal estate of the value of about $7,000. She had in her infancy been adopted by Robert Patten and his wife, who then lived in Portland in this state, but afterwards removed to the state of Pennsylvania. Mrs. Patten died in 1846, leaving a will, by which she gave her property, amounting to about $3,000, to the said Julia, subject to a life estate in her husband in a certain lot of land in Portland, in which she also gave an interest to Franklin Goodspeed, the husband of the said Julia, jointly with her. Mr. Patten died in 1858, leaving a will, by which he gave his property to the said Julia, amounting to between $3,000 and $4,000. A house in Portland which had been built by Mr. Patten after his wife's death on the land devised to him for life by her, with the reversionary interest of Franklin Goodspeed, which he had purchased, constituted a considerable item of his estate. Some time previous to her death the said Julia obtained a divorce from her husband, and was unmarried at the time of her death. She was living at the time of her death in the family of the respondent, in Portland, in the house built by Mr. Patten, which the respondent hired of her. She occupied two rooms, one as a sleeping apartment, and the other as a store room. Her sleeping apartment was furnished by her with her own furniture, and also contained a part of her wearing apparel. The store-room contained household furniture, and housekeeping goods of various kinds, including the household furniture belonging to Mr. Patten's estate, which was not then settled, as well as that belonging to herself, the value of the whole of which was about $490. Very soon after her decease the keys of both rooms were delivered by the respondent to Mr. Emory, a clergyman who resided near by, for safe keeping. At the time of her decease the respondent did not know that she had any heir or heirs. Being desirous to purchase the

house in which he lived, and having learned that her father resided in Williamsburg, in the state of New York, he went there about the 1st of October, 1859, to ascertain what the fact was, and learned from him that the petitioner was a brother of the said Julia and when last heard from resided in New Haven. On the 12th of October, 1859, the respondent went to New Haven, to find the petitioner, and there found him. The petitioner had not learned that his sister had deceased, nor did he know anything in regard to the character, condition or value of her estate until then informed by the respondent. The latter informed him that she had left some property to which he as her heir would be entitled, and represented her estate as consisting of the house and land in Portland before mentioned, and about an hundred acres of wild land in the state of Pennsylvania, worth about $1.25 per acre, and on which there was a mortgage of $400, and on which the taxes had not been paid; and represented the incumbrances on the whole estate as amounting to about $1,400. He then .inquired of the petitioner if he wished to sell his interest in the estate; the petitioner replied that if there was any property there to which he was entitled he should want to sell it. The respondent replied that he thought he should be able to save the petitioner about $1,000 out of the estate after paying the debts. No contract was made between the parties at that time, but it was agreed that the petitioner should go up to Portland on the following Friday, and that the respondent should meet him at the railroad station in Middletown, and take him to his place of residence in Portland; and the respondent requested the petitioner not to make himself known there as the brother of the said Julia, because that if the heirs of Mrs. Patten should discover that he was the heir of said Julia, they would attempt to break the will of the former, and might deprive the petitioner of the whole of the estate.

On the 13th of October the respondent communicated to Doct. Geo. O. Jarvis, of Portland, in confidence, the fact that he had found the heir of said Julia, that he was coming up to Portland the next day, and that he, the respondent, talked of purchasing his interest in the estate, and requested Jarvis'

opinion as to whether a quitclaim deed from the petitioner to the respondent would convey to him a good title to the estate. The respondent did not communicate the fact of his having seen the petitioner to any other person. The petitioner went to Portland, to the residence of the respondent, on the 14th day of October, to which he was taken from the railroad station in Middletown by the respondent. He was then informed by the respondent that the house in which they then were was the one mentioned by him as belonging to said Julia's estate, and that he believed that the appraisers on Mr. Patten's estate had appraised it at $3,500,—that there was some household furniture belonging to the estate, but how much he did not know, the said Julia having sold a part of it previous to her decease,—and that there was also some of her wearing apparel belonging to the estate, but how much he did not know,—that he could not show either the wearing apparel or the household furniture to the petitioner, because the rooms which contained them were locked and he had not the keys. He also stated to the petitioner that there were no monies in bank or promissory notes belonging to the estate.

The representation of the respondent in regard to the house and land in Portland, that they had been appraised at $3,500, was true. The representations in regard to the quantity and value of the land in Pennsylvania were not true ; there being in fact one hundred and ten acres, of the value of $800, and the same not being incumbered by mortgage or taxes. The respondent did not know the quantity, value, or location of the land. There were also in fact monies in bank and promissory notes belonging to the estate, to the amount of over $2,000, but the respondent did not know of the existence of the same. In a conversation however between the respondent and the executor of Mr. Patten's will, a few days after the decease of said Julia, the respondent had been informed by him, that in his opinion, after all debts were paid, the estate of the said Julia would be worth not less than eight or ten thousand dollars. The respondent did not communicate this fact to the petitioner. The respondent did not know the precise value or amount of the household furniture or

wearing apparel, but did know that there was a considerable quantity of both. The petitioner did not ask to examine them. Said Julia had sold a small part of her household furniture previous to her decease. The respondent did not have reasonable ground to believe, and did not believe, that the heirs of Mrs. Patten would attempt to contest the validity of her will.

After making the foregoing representations the respondent informed the petitioner that Doct. Jarvis, who lived near by, and had been the confidental adviser and physician of Mr. Patten, and also the physician of said Julia, knew more about the estate than he did, and could give him more information. The petitioner requested that he might be sent for, and he was called in. Jarvis then, in the presence of the respondent, informed the petitioner as to the title of said Julia to the house and land in Portland, and gave him a true statement thereof, and stated to him that she had been divorced from her husband, and that he supposed he no longer had any interest therein. He also stated that Mr. Patten, or said Julia, or both of them, had some property in Pennsylvania, but how much he did not know ; that he had the impression there were about three hundred acres of land remaining, chiefly timber lands ; that he knew some part of it was regarded by Mr Patten as chiefly valuable for a mill privilege thereon ; but that it was not now in use, but would be at some future time. He also stated the value of the house in Portland to be about $3,000, but did not state the value of the land in Pennsylvania. He also informed the petitioner that the executor of Mr. Patten was living near by and could be seen, and could give him more information in regard to the Pennsylvania property than any body else; but the petitioner did not go to see him, and relied entirely upon the representations of the respondent and Jarvis. Jarvis gave the petitioner a correct statement of the claims against the estate so far as he knew, and stated to him that they might amount to ten or twelve hundred dollars. They did in fact amount to more than that. He also stated that other claims might be presented against the estates, as both estates were still unsettled, which was also true. He

also stated to the petitioner, that he was not yet satisfied that the said Julia had not left a will, as he knew that she promised Mr. Patten to do so if she survived him, and that as yet there had been but a slight examination of her papers ; and that if she had made a will, the petitioner might depend upon it he would not get one cent. She in fact died intestate ; but one of the inducements to the making of the contract between the petitioner and the respondent, was the apprehension in the mind of the petitioner, occasioned by this representation, that a will might thereafter be found. Jarvis also stated to the petitioner that there was not so much property belonging to the estate as the petitioner might suppose, because Mr. Patten had in his life time, from time to time, sold land in Pennsylvania to obtain means for his support, as it had taken most of his ready money to purchase the interest of the husband of said Julia in the house and land in Portland, which representation was true ; but Jarvis did not know how much or what kind of property there then was in Pennsylvania belonging to the estate, nor as to the amount of the property in Portland, except as to the house and land, which latter he knew to be worth $3,500. Jarvis also stated to the petitioner that Mrs. Patten had left two wills, one executed previous to the one proved, and that he had reason to believe there would be trouble about them, for he had heard her brother say that he should contest the last one if the estate of said Julia was going to her heirs. Mrs. Patten did in fact leave two wills, and her brother had said to Jarvis that a contingency might arise in which the will would be contested—that if the estate was going to the heirs of said Julia, and they should find there was a fair prospect of success, the heirs of Mrs. Patten might contest the will ; but he had never said to him in direct terms that the heirs would contest the will in case the estate went to the heirs of said Julia, and Jarvis had no reason to suppose that the will would be contested. Jarvis also stated to the petitioner that the heirs of Mrs. Patten were wealthy, and able to keep the matter in litigation some time, and probably would.

It was not stated to the petitioner, either by Jarvis or the respondent, how much or what part of the estate of said Julia

was derived from the will of Mrs. Patten, but both the re_ spondent and Jarvis knew that the whole of the estate was not. The petitioner believed, and had reason to believe, from the representations made to him by the respondent and Jarvis, that his title to the whole estate of said Julia was dependent on the validity of the will of Mrs. Patten, and that the will would be contested, and kept in litigation for a long time. The respondent was present when all these representations were made to the petitioner by Jarvis, and assented thereto.

The petitioner made no inquiries of any other person in regard to the estate of said Julia, but relied entirely upon the representations of Jarvis and the respondent in regard to the same, and did not know the real value of the estate, nor did he comprehend the nature and extent of his interest therein. After the making of the representations by Jarvis and the respondent, the petitioner inquired of Jarvis if he would purchase his interest in the estate. Jarvis replied that he would not, as he did not want the property, and it might involve him in a quarrel with his best friends, meaning the heirs of Mrs. Patten. The petitioner then inquired of the respondent how much he would give for his interest in the whole estate, and run his own risk without any future recourse to him. The respondent replied that under all the circumstances he would give him $1,000, or the petitioner might wait and make further inquiries, or till the estates were settled, and then he would purchase the place in Portland for what it was worth. The petitioner accepted the offer of $1,000, and it was agreed that he should receive $300 in money at that time, and the respondent's notes for $200 payable in two weeks and $500 payable in three months. The money was then paid to the petitioner and the notes executed and delivered. The petitioner at the same time executed release deeds of all his interest in the estate, and delivered the same to the respondent. The deeds were read to the petitioner before he executed them, and he comprehended their import.

The petitioner's mind, by reason of his having been for a long time grossly intemperate, had become enfeebled and dull of apprehension. He was also unacquainted with business

affairs, except of the simplest nature, and he did not properly and fully comprehend the nature and extent of his interest in making the contract with the respondent, but supposed that he was receiving the fair value of the interest released.

Within a few days after the making of the contract, the sum of $300 and interest, and the notes of the respondent, were tendered back by the petitioner, and a re-conveyance of his interest in the estate demanded, but the respondent refused to receive the money or notes or to re-convey. The money due upon the notes was tendered to the petitioner by the respondent as the notes became due, but the petitioner refused to receive it. The respondent was in fact insolvent at the time the notes were given, but the petitioner made no inquiries as to his solvency.

The committee found no actual fraud on the part of the respondent, and no fraud, unless there was in law a constructive fraud arising from the facts found.

The superior court accepted the report of the committee, adjudged that the petitioner was entitled to the relief sought, and passed a decree setting aside the conveyances made to the respondent by the petitioner. The facts reported by the committee were not otherwise found by the court than by the acceptance of the report. The respondent filed a motion in error and brought the record before this court for revision.

*Tyler* and *Culver*, for the plaintiff in error.

The bill proceeds solely upon the ground of fraud, and none having been found, either actual or constructive, the decree can not be sustained. The committee expressly find that there was no actual fraud, and the court simply accepts the report and adjudges that the petitioner is entitled to the relief sought, but does not make any finding of constructive fraud. There is therefore on the record no fraud found. Further, the court does not even find the facts reported by the committee. A mere acceptance of the report is not a sufficient finding of the facts. The statute expressly requires the court to find in its decree all the facts on which the decree is founded. Rev. Stat., tit. 12, § 7.

But the facts reported by the committee do not warrant the inference of fraud. No such weakness of mind is found as amounts, either in law or equity, to an incapacity to contract. 2 Swift Dig., 64, *et seq.* 2 Parsons on Cont., 84. 'Adams' Equity, 183. Neither does the inadequacy of price, in connection with the mental weakness, furnish ground for inferring fraud. Inadequacy of price is in no case fraud *per se* ; it may be evidence of fraud in some cases. 2 Swift Dig., 47. 1 Story Eq. Jur., §§ 224, 225. *Eyre* v. *Potter*, 15 How., 59. Even gross inadequacy of price is no ground for setting aside a deed where the value of the property was uncertain. 2 Swift Dig., 48. Here there was no such gross inadequacy when we consider the actual condition of the property. The amount of claims against it was not then known, and the amount of the property was uncertain. There was also a question with regard to the validity of Mrs. Patten's will, upon which the title to a great part of the property depended. It was also not certain that Mrs. Goodspeed herself had not left a will, and the respondent had reason to apprehend that she might have done so. It is found that she had declared that she would make one ; and if she had made one there is every reason to believe that she would have given nothing to the petitioner, who had been estranged from her for many years, and was a man of intemperate habits. Nor do the representations of the respondent at and preceding the time of the conveyance, nor his neglect to give full information to the petitioner, amount to fraud. There is an important distinction recognized in the authorities between the representations of a vendee and those of a vendor, as affecting such a transaction. Where a vendor makes a statement which is false with regard to the property, but which he does not know to be false, it is held a fraud, because it is equally injurious to the vendee whether he knew it to be false or not. The vendor is held to be bound to know whether his representations are true, and they operate in equity as a warranty. But it is not so with statements of a vendee. *Smith* v. *Richards*, 13 Pet., 26. 1 Story Eq. Jur., §§ 200, 204, 207. Adams' Equity, 178. In all the cases in the books where conveyances have been set aside for represent-

ations made without fraud, they have been representations of the vendor. Here the representations are expressly found to have been made without any fraudulent intent. Most of the statements were mere statements of opinion, and the whole matter was as open to inquiry on the part of the petitioner as on the part of the respondent, and equally within the reach of ordinary diligence. The respondent referred to Dr. Jarvis as a person who knew more than he did himself as to the condition of the property, and the petitioner made what inquiries he chose to make of him, and it does not appear that Dr. Jarvis did not give him as full information as he was able, and it is not found or pretended that there was any collusion between the respondent and him. The respondent, in reply to the petitioner's inquiry what offer he would make him for the property, said he would give him $1,000, or that he could make further inquiries, or wait till the estate was settled, when he would purchase the place in Portland and give him what it was worth. If the respondent did not conduct with entire honor and conscientiousness in the matter, that would not be a reason for setting aside the deed. 1 Story Eq. Jur., §§ 194, 197, 205, 207. The deeds were read to the petitioner, so that he fully comprehended what he was doing. There was no such confidential relation between the parties as often constitutes an equitable ground for setting aside a contract. This confidential relation is held in *Miller* v. *Welles*, 23 Conn., 21, to be essential to a case of constructive fraud. Where a conveyance is already made, a court of equity will often refuse to set it aside, although it would have refused to aid the grantee by enforcing a contract for the conveyance, or would have granted relief against the contract. *Adams' Equity*, 174.

*Phelps* and *Warner*, with whom was *Hall*, for the defendant in error.

The finding of the committee that there was no actual fraud can have no effect against facts found which show clearly that there must have been actual fraud. But it is not necessary that there should be such fraud if the facts are such that a court of equity can infer from them constructive or implied

fraud, and can see in them a reason for its interposition. 1 Story Eq. Jur., §§ 186, 7, 8. *Pettibone* v. *Stevens*, 15 Conn., 19. *Story* v. *Norwich & Worcester R. R. Co.*, 24 id., 94. *Brainerd* v. *Arnold*, 27 id., 626. Here the facts found present a clear case for equitable relief. The inadequacy of consideration is enough to show that the bargain was inequitable and unconscientious if not actually fraudulent on the part of the respondent. *Ld. Chesterfield* v. *Janssen*, 2 Ves. Sen., 155. *Seymour* v. *Delancey*, 6 Johns. Ch., 222. 1 Hilliard on Vendors, 354. But if inadequacy of consideration standing alone is insufficient to set aside a deed, slight additional suspicious circumstances will make it sufficient. *Tracey* v. *Sacket*, 1 Ohio S. R., 54. 1 Story Eq. Jur., § 246. Weakness of intellect, in connection with inadequacy of consideration, forms a strong ground for equitable relief. *Clarkson* v. *Hanway*, 2 P. Wms., 203. *Lawley* v. *Hooper*, 3 Atk., 278. *Mann* v. *Betterly*, 21 Verm., 326. *Hall* v. *Perkins*, 3 Wend., 626. 1 Story Eq. Jur., § 236. 2 Swift Dig., 47. Ignorance of the character and extent of a party's rights, especially when coupled with weakness of mind and inadequacy of consideration, forms another strong ground for relief. 2 Swift Dig., 41. *Callender* v. *Colegrove*, 17 Conn., 24. *Turner* v. *Harvey*, 1 Jacob, 169. *Pickering* v. *Pickering*, 2 Beavan, 31. *Maddeford* v. *Austick*, 1 Simons, 89. And in such a case the fact that the parties were mutually ignorant does not affect the case. *Reynell* v. *Sprye*, 8 Hare, 254. *Ainslie* v. *Medlycott*, 9 Ves., 21. *Burrows* v. *Lock*, 10 id., 470. When to the consideration of the petitioner's ignorance and imbecility, and of the inadequacy of the price, we add that of the representations of the respondent, and of his conduct generally in the whole transaction, the case becomes one which imperatively demands the relief sought, and at which the court can not hesitate. These representations may have been fraudulent in fact even if their falsity was not known to the respondent, since he made them without knowing that they were true, and for the purpose of operating upon a weak and ignorant man. It has been held in many cases to be enough if the representation produced the effect sought, whether it was known to be

false or not.  *Boyd* v. *Browne*, 6 Penn. St., 310.   *Tryon* v. *Whitmarsh*, 1 Met., 8.   *Lobdell* v. *Baker*, id., 201.   *Stone* v. *Denny*, 4 id., 151.  *Watson* v. *Poulson*, 7 Eng. L. & Eq., 585. 2 Smith's Lead. Cases, 55 *et seq.*  In a court of equity the question of fraud is not necessarily one of intention.  An actual misrepresentation, upon which the other party acts, will be a ground for setting aside a conveyance, though innocently made.  2 Swift Dig., 41.   1 Story Eq. Jur., § 193. *Reynell* v. *Sprye*, 8 Hare, 222.   *Ainslee* v. *Medlycott*, 9 Ves., 21.   *Tyler* v. *Black*, 13 How., 231.   *Rosevelt* v. *Fulton*, 2 Cowen, 129.   *Daniel* v. *Mitchell*, 1 Story, 172.   And in any case, if an unconscientious advantage has been taken of the imbecility or ignorance of a man, and he has been induced to part with his property for a wholly inadequate consideration, and especially where he has been influenced by representations made to him by the party with whom he deals that were untrue in fact, a court of equity will set the contract aside even though there has been no fraud in fact.   Equity infers fraud in such a case.   1 Maddock Ch., 205.   *Callender* v. *Colegrove*, 17 Conn., 1.   *Foster* v. *Charles*, 7 Bing., 105.*

ELLSWORTH, J.   It is a serious difficulty with this writ of error that it does not bring up for review any specific decision or ruling of the court, but the whole case as it lay before the judge upon the evidence.

It is said however that the record certainly discloses one error in law, to wit, that the court found no facts whatever upon which to base its decree ; that it only accepted the report of a committee but found nothing itself.   If this were an error,

---

* While one of the counsel for the defendant in error was commenting on the case of *Miller* v. *Welles*, (23 Conn., 21,) cited on the other side, Storrs, C. J., interposed as follows :—" The case of *Miller* v. *Welles* was not a case of *constructive fraud* at all.   It was a question wholly of fraudulent *intent*, of an *actual intent to defraud*, and the committee found that there was no such intent, and we felt bound by that finding.   Actual fraud is *cheating;* constructive fraud or fraud in law is where the law imputes fraud *in the absence of any fraudulent intent;* as where a guardian, or a person in a confidential relation, has a transaction with the person trusting him in that relation, in which case the court will sometimes find legal fraud even though there is no actual intent to defraud."

and one of which advantage could be taken by this proceeding, it should have been assigned among the errors relied upon. But we are of opinion that it is not an error, in view of the practice of the court. An acceptance of a report from a committee appointed by the court, if there is nothing more, is an adoption of the finding of the committee by the court, and a sufficient finding of the facts reported.

Nor is there force in the objection that the committee do not themselves expressly find fraud in the respondent, but only certain facts from which the law may infer fraud ; or, we should rather say, facts from which the law justly assumes a wrong to have been done—facts which show that the deed in question was obtained under circumstances which in conscience and good faith require it to be set aside. The judgment itself we think is a sufficient finding and application of the law to the facts reported to sustain the decree setting aside the deed as illegal and void. It may be otherwise where there is no fraud or wrong except through a fraudulent motive or purpose in fact. In that case the fraud should be found by the committee or the court. Without such a finding no wrong is disclosed, and no ground laid for the interposition of a court of equity. This distinction is well illustrated in *Pettibone* v. *Stevens*, 15 Conn., 19, where a mortgage given to secure a note honestly executed, but which could not be enforced against attaching creditors, was held to be void as fraudulent in the judgment of the law. A court of equity has no occasion to find fraud, in so many words, as an inference of law, beyond what it does by announcing what the law is upon the facts established or admitted.

It appears that, for a long time before the deed was executed, the grantor had been grossly intemperate, until his mind had become enfeebled and dull of apprehension ; that he was unacquainted with business affairs except of the simplest nature, and did not properly and fully comprehend the nature and extent of the contract in question ; that the property conveyed (the whole of it being of the value of some seven thousand dollars,) was sold for a thousand dollars, two hundred of which was paid in cash and the rest in the notes of the grantee

who was a bankrupt; that at the time the grantor was wholly ignorant of the *character, condition* and *value* of the estate he had inherited, and which he was then contracting to sell to the respondent, and that in fact he did not know of the death of the relative from whom the property had descended to him (having lived at a distance from her,) until he was informed by the respondent, who had sought him out expressly to obtain the property from him; that while the respondent was aware of the utter ignorance of the petitioner with regard to the property, he did not give him a correct statement with regard to it, according to what he believed, or had reason for believing, to be the fact, but on the contrary, then, and at the subsequent interview when the estate was conveyed, suppressed certain facts which were material to a proper understanding of the transaction on the part of the petitioner, and positively stated what in fact was not true, and what he had not good reason for believing to be true; and at the same time he excited the fears of the petitioner lest he should lose the property, by representing that the heirs of Esther Patten, under whose will the petitioner indirectly claimed, was in danger of being set aside, when in fact, as the committee finds, the respondent " had no reason to suppose that the will would be contested." There were other representations made by the respondent at the time which were not known by him to be true, and which he could have been justified in making to one so ignorant, imbecile and confiding as the petitioner, only by positive knowledge of their truth. Besides all this, the respondent took pains to keep the petitioner out of sight, and to prevent his having communication with any one when he went to Portland to look at the estate, which was the only time that he ever saw it. This course of conduct can have but one aspect in a court of equity. We need not go more into particulars to show the propriety of the decision of the court below. Considering the imbecility and ignorance of the petitioner, the gross inadequacy of the price, the deceptive representations made by the respondent, and the suppression by him of facts material to a proper understanding of his rights by the petitioner, we do not hesitate to say that the deed in question

can not, upon acknowledged principles of law and equity, be sustained.

There is no error in the judgment complained of.

In this opinion the other judges concurred.

Judgment affirmed.