## LOMAN *et al.* v. PAULLIN.

No. 5220.   Opinion Filed September 21, 1915.

(152 Pac. 73.)

1.   **EVIDENCE — Stipulations — Competency as Evidence—Special Agreements.**   An agreed statement of facts or other stipulations by counsel or attorneys as to matters of fact within the scope of their professional function bind the party as a judicial admission, although made before issue joined, and are competent evidence against him, even on a second trial.   Where these agreements are made to avoid continuances or for some other specific purpose, and are by their terms limited to a particular occasion or temporary object, they possess no force beyond the occasion or after the purpose has been accomplished.

2.   **CONTRACTS — Capacity to Execute—Weak-Mindedness.**   Mere weak-mindedness, whether natural or produced by old age, sickness or other infirmity unaccompanied by any other inequitable incidents, if the person has sufficient intelligence to understand the nature of the transaction, and is left to act upon his own free will, is not a sufficient ground to defeat the enforcement of an executory contract, or to set aside an executed agreement or conveyance.

3.   **CONTRACTS—Interference by Court—Grounds.**   If a court can see that there were no inequitable incidents, such as undue influence, great ignorance and want of advice, very inadequate price, and the like, it will not interfere merely because one party possessed very much less intelligence than the other, nor because the transaction is not one which the court in all respects approves.

4.   **INSANE PERSONS—Executed Contracts—Rescission—Conditions Precedent.**   An executed contract for the sale of land, made by a weak-minded, ignorant, and even insane person, without fraud, or notice to the vendee of the grantor's insanity, and for a fair consideration, will not be set aside, either in law or in equity, in favor of the vendor or his representatives, unless the purchase money be restored, and the parties fully reinstated to the condition in which they were prior to the purchase.

5. **CONSTITUTIONAL LAW—Indians—Due Process—Alienation of Indian Lands—Removal of Restrictions.** The original acts of Congress, treaties, and agreements, with the several tribes of Indians of the Indian Territory, which restricted the alienation of their lands, or any part thereof, did not confer a vested right in such Indians to hold said lands free from alienation until the complete expiration and fulfillment of said acts of Congress, treaties, and agreements, with said Indians; and a subsequent act of Congress removing said restrictions upon alienation is not in violation of that part of the fifth amendment of the Constitution of the United States which provides that no person shall be deprived of property without due process of law. And **held,** further, that a citizen or ward of the government can acquire no vested rights in a statutory privilege, exemption, or disability, and the power which has a right to provide a restriction or disability also has the power to remove it.

6. **INDIANS—Indian Treaties—Right to Abrogate.** The power exists to abrogate the provisions of an Indian treaty, though presumably such power will be exercised only when circumstances arise which will not only justify the government in disregarding the stipulations of the treaty, but may demand, in the interest of the country and the Indians themselves, that it should do so. When therefore treaties were entered into between the United States and a tribe of Indians, it was nver doubted that the power to abrogate existed in Congress, and that in a contingency such power might be availed of from considerations of governmental policy, particularly if consistent with perfect good faith towards the Indians.

(Syllabus by Robberts, C.)

*Error from District Court, Bryan County:*
*Jesse M. Hatchett, Judge.*

Action by Lewis Paullin against Oscar Loman and others. Judgment for plaintiff, and defendants bring error. Affirmed.

*J. M. Crook* and *N. B. Maxey,* for plaintiffs in error.

*Robert Crockett* and *V. B. Hayes,* for defendant in error.

Opinion by ROBBERTS, C. This case comes from the district court of Bryan county, and is an action to quiet title. The land involved is the east half of the

northwest quarter, and the west half of the northwest quarter of the northeast quarter of section 6, township 7 south, range 9 east, being the allotment, with the exception of his homestead, of Thomas Loman, who was a full-blood Choctaw Indian. The title of plaintiff rests on a deed from Loman and wife to A. S. Hawk, dated January 31, 1906, based upon a certificate of the Acting Secretary of the Interior, purporting to remove the restrictions on alienation of the lands involved. The defendant in error was the plaintiff below, and Lillie Edwards, Eli P. Williams, Elmer Williams, Charles H. Williams, Frank C. Sabourne, Oscar Loman, and Annie Loman, the last two being minor heirs of Thomas Loman, deceased, and Hagon John, guardian of said minor heirs, were the defendants below, and said parties will be designated "plaintiff" and "defendants" herein, as in the lower court.

J. M. Crook was duly and legally appointed guardian *ad litem* for the minors Oscar and Annie Loman. The answer of the guardian *ad litem* alleges: (a) That there was a prior suit in the district court of Bryan county, between the same parties, involving the same land, in which the same issues involved herein were adjudicated; (b) that the plaintiff herein, who was also plaintiff in that suit, made certain admissions in his answer therein, contrary to and against his claim and interest, as alleged in this case. And said guardian *ad litem* for his further answer herein alleges: (c) That the deed from Thomas Loman to A. S. Hawk, upon which the plaintiff's title depends, is void, for the reason that at the time said Loman made, executed, and delivered said deed, he was "notoriously of unsound mind, and notoriously incompetent, and had no mental capacity, and therefore without power to convey said land to said Hawk." And further:

"That said deed from Loman to Hawk is void because when Loman executed said deed, said land was not alienable, under the Patent Power of Attorney Acts of Congress, treaties and agreements referred to in said answer; therefore Loman was without power to sell or convey said land when he executed said deed to Hawk."

The defendant Sabourne filed a disclaimer, and the other defendants filed answers, the same as that of the guardian *ad litem* for said minor heirs, with a prayer that said minors, Oscar and Annie Loman, recover all the lands, with the value of the rents demanded in their answer and cross-petition.

As stated by counsel for plaintiffs in error in their brief:

"This narrows the issue down to the issues formed between the plaintiff and the minor defendants, Oscar and Annie Loman, as none of the other defendants asked for any other or further relief."

The case was tried to the court without a jury, and judgment rendered in favor of plaintiff, in which it was decreed:

"That the power of attorney executed by defendant Lillie Loman (who was the wife of Thomas Loman, and after his death married to a man by the name of Edwards), to defendants Eli P. Williams, Charles H. Williams, and Elmer Williams, dated the 24th day of June, 1907, and recorded in the office of the register of deeds of Bryan county in Book 29, at page 6, be and the same is hereby canceled, revoked, annulled and set aside, and removed as a cloud upon plaintiff's title to the following described real estate, wit:   E. $\frac{1}{2}$ of N. W. $\frac{1}{4}$ and W. $\frac{1}{2}$ of N. W. $\frac{1}{4}$ of N. E. $\frac{1}{4}$ of section 6, township 7 S., range 9 E. of the Indian Base and Meridian, and lying and being in Bryan county, State of Oklahoma.   That the quitclaim deed executed by the said defendant Frank C. Sabourne, to the heir of Thomas Loman, on the 23d day of

December, 1908, and recorded in the office of the register of deeds of Bryan county, Okla., in Book 34, at page 66, be and the same is hereby canceled, revoked and annulled, and set aside, and removed as a cloud upon plaintiff's title to the said above-described real estate. And that the lease executed by the said Hagon John, guardian of the said minor defendants, Oscar Loman and Anna Loman, dated the 15th day of February, 1910, and recorded in the office of register of deeds of Bryan county, Okla., Book 43 at page 348, be and the same is hereby canceled, revoked, annulled and set aside, and removed as a cloud upon plaintiff's title to the said above-described real estate."

Motion for new trial was duly made, and overruled, from which judgment and decree defendants bring error. Counsel present eight assignments of error, but in their brief admit that there are only three vital questions to be considered, which are as follows:

"First. That Thomas Loman was wholly incompetent to transact any business, and especially such as the sale or leasing of real estate. That he had no idea of values, and was a full-blood Choctaw, illiterate, and ignorant of the English language, and his life had been such that he had had no training in business matters of any kind, and was wholly incompetent to execute the deed upon which plaintiff's title is rested.

"Second. That Thomas Loman could not make a valid conveyance of his allotment at the time of the execution of said deed, for the reason that the right to alienate his allotment was restricted by the patent to Loman, power of attorney and the act of Congress approved July 1, 1902, commonly known as the Choctaw-Chickasaw Agreement.

"Third. The court erred in canceling the power of attorney of Charles H. Williams, because in Paullin's petition it showed no ground for cancellation."

The first contention of counsel is that Thomas Loman was mentally incompetent on the 31st day of January, 1906, at the time he executed and delivered the deed to A. S. Hawk. They seem to base this contention (a) upon the ground that, in another suit in the same court, it was stipulated in an agreed statement of facts:

"That Thomas Loman was a citizen by blood of the Choctaw Nation, was a full-blood Choctaw Indian, illiterate, and ignorant of business transactions, and incompetent to transact such business as the sale or leasing of real estate."

And that testimony was introduced in the trial of this case to the effect (b) that:

"At the time Loman executed the deed to Hawk, he was weak-minded, illiterate, and utterly incapable of understanding business transactions, such as the sale and leasing of real estate; that he had no conception of the value of anything; that he could not tell the difference between the value of $1 and $100; and that he was utterly incapable of transacting business of any kind intelligently."

This was all the testimony offered touching the incompetency of Loman. While the court admitted in evidence the stipulation, in another and entirely different case, as to the condition of Loman's mind, we cannot feel that it has any bearing or influence here. The briefs fail to state the necessary facts to show that the parties and issues in that case and the case at bar were the same, and the stipulation itself shows that it was made by the attorneys simply in that case, and for the purposes of that case. Evidently it was the usual admission in the case on trial, for the purpose of that case only. Strictly speaking, it is not competent evidence in this case,

and should not, and most likely was not, considered by the court as evidence. The rule laid down in Cyc. 15, p. 973, is as follows:

"An agreed statement of facts or other stipulations by counsel or attorneys as to matters of fact within the scope of their professional function bind the party as a judicial admission, although made before issue joined, and is competent evidence against him even on a second trial. Where these agreements are made to avoid continuances or for some other specific purpose, and are by their terms limited to a particular occasion or temporary object, they possess no force beyond the occasion or after the purpose has been accomplished."

Evidently, the term "second trial," above mentioned, has reference to, and means, a second trial in the same case.

In Jones on Evidence (2d Ed.) at section 259, it is said:

"The admissions made by an attorney in one action are not admissible in a different action between the same parties."

In the case of *Isabelle v. Iron Cliffs Co.*, 57 Mich. 120, 23 N. W. 613, the court said:

"The stipulation of facts made in another case by the attorneys therein was not admissible in this. The only ground upon which its reception could be based was that it contained admissions of the party of the existence of certain facts. Attorneys as the agents of parties whom they represent in a cause have authority, by virtue of such agency, to make admissions, which are binding upon the parties in that particular case; but they have no authority by reason of such relation to bind a party generally by admission of facts. Their agency is for a special purpose, and for a specified transaction, and their admissions made with reference thereto are binding upon

the party they represent. But admissions so made cannot bind the party in other suits or proceedings between other parties."

To the same effect: Encyclopedia of Evidence, vol. 1, pp. 470, 471; *Wilkins v. Stidger*, 22 Cal. 231, 83 Am. Dec. 64; *Cent. Branch Union Pac. R. Co. v. Shoup*, 28 Kan. 394, 42 Am. Rep. 163.

It will be remembered that fraud was neither alleged nor proven, and no undue influence or coercion was used to obtain the deed from Loman. His wife, the defendant herein, Lillie Edwards, appears from all the records to be a woman of intelligence and considerable business tact and ability. She was a party to the conveyance to Hawk, and so far as we have been able to learn has made no complaint of the dealings with herself and husband.

In Pomeroy's Equity Jurisprudence, vol. 2, at section 947, the law is thus laid down:

"It is equally certain that mere weak-mindedness, whether natural or produced by old age, sickness, or other infirmity, unaccompanied by any other inequitable incidents, if the person has sufficient intelligence to understand the nature of the transaction, and is left to act upon his own free will, is not a sufficient ground to defeat the enforcement of an executory contract, or to set aside an executed agreement or conveyance."

In the note to the text it is said:

"If a court can see that there were no inequitable incidents, such as undue influence, great ignorance and want of advice, very inadequate price, and the like, it will not interfere merely because one party possessed very much less intelligence than the other, nor because the transaction is not one which the court in all respects approves."

Notwithstanding the fact that the burden of proof is upon those who are attacking Paullin's title, we submit that there is not only no sufficient evidence, but no evidence at all, of any kind or character, to show that Hawk or Fuller had any knowledge or notice of the incompetency, if any, of Thomas Loman. There is nothing in the entire record to show that Hawk, the immediate grantee of Thomas Loman, acted otherwise than honestly and in good faith with his grantor, or that he paid for the land purchased from Thomas Loman anything but a sufficient and adequate consideration, or that the deed to him was not for the benefit of his said grantor. These facts being true, no grounds exist whereby the deed to S. A. Hawk might be set aside at the suit of Thomas Loman or his representatives.

We quote again from Pomeroy, vol. 2, sec. 754:

"There are two special rules on the subject which have been settled since an early day; one being a mere application of the general doctrine, and the other a necessary inference from it. The first is that, if a second purchaser for value and without notice purchase from a first purchaser who is charged with notice, he thereby becomes a *bona-fide* purchaser, and is entitled to protection. This statement may be generalized. If the title to land, having passed through successive grantees, and subject in the hands of each to prior outstanding equities, comes to a purchaser for value and without notice, it is at once freed from these equities; he obtains a valid title, and with a single exception, the full power of disposition.

"The second rule is that if a second purchaser with notice acquires title from a first purchaser who was without notice, and *bona fide,* he succeeds to all the rights of his immediate grantor. In fact, when land once comes, freed from equities, into the hands of a *bona fide* purchaser, he obtains a complete *jus dispondendi,* with the

exception last above mentioned, and may transfer a perfect title even to volunteers."

Again, Buswell on Insanity, section 413, says:

"A completed contract for the sale of land, made by an insane vendor, without fraud, or notice to the vendee of the grantor's insanity, and for a fair consideration, will not be set aside, either at law or in equity, in favor of the vendor or his representatives, except the purchase money be restored, and the parties fully reinstated in the condition in which they were prior to the purchase. This rule appears to be unquestioned in the English courts."

To the same effect is the able opinion of Horton, C. J., in *Gribbon v. Maxwell*, 34 Kan. 8, 7 Pac. 584, 55 Am. Rep. 233, decided in 1885, in which numerous authorities are reviewed and commented upon, and also *Behrens v. McKenzie*, 23 Iowa, 333, 92 Am. Dec. 428, in which the opinion is delivered by a very eminent judge (Dillon), and *Corbit v. Smith*, 7 Iowa, 61, 71 Am. Dec. 431; *Allen v. Berryhill*, 27 Iowa, 534, 1 Am. Rep. 309; 2 Pomeroy's Eq. Jur. sec. 946. See, also, *Scanlan v. Cobb*, 85 Ill. 296; *Young v. Stevens*, 48 N. H. 133, 2 Am. Rep. 202, 97 Am. Dec. 592; *Eaton v. Eaton*, 37 N. J. Law, 108, 18 Am. Rep. 716; *Freed v. Brown*, 55 Ind. 310; *Carr v. Holliday*, 40 N. C. 167. In *Lancaster, etc., Bank v. Moore*, 78 Pa. 407, 21 Am. Rep. 24, a lunatic was held liable upon a note discounted for him by the bank, and Paxson, J., says:

"It would be an unreasonable and unjust rule that such persons should be allowed to obtain the property of innocent parties and retain both the property and its price. Here the bank in good faith loaned the defendant money on his note; the contract was executed so far as the consideration is concerned, and it would be alike derogatory to sound law and good morals that he should be allowed to retain it to swell the *corpus* of his estate."

To the same purport are *Person v. Warren,* 14 Barb. (N. Y.) 488, and *Allis v. Villings,* 6 Metc. (Mass.) 415, 39 Am. Dec. 744. The courts have gone further, and held that when the contract is fair and *bona fide,* executed, and completed, and the parties cannot be again put *in statu quo,* and there was no notice of mental incapacity, the court will not set aside the contracts at all. *Molton v. Camroux,* 2 Ex. 487, affirmed on appeal 4 Ex. 17; *Yanger v. Skinner,* 14 N. J. Eq. 389; *Neil v. Morley,* 9 Ves. 478; also, Lord Chancellor Truro in *Price v. Verrington,* 3 Man. & G. 498, and Lord Granworth in *Elliott v. Ince,* 7 De Gex, M. & G. 474.

It is clear, from these authorities, that the conveyances of an insane person not previously declared insane are voidable merely, and not void; that the right to set them aside is based upon the ground of fraud; and that the court will not usually interfere unless there has been fraud, or a knowledge of the insanity of the other party, and will then place the parties *in statu quo.*

But, above and beyond all this, the question of Loman's competency was passed upon by the trial court, who saw and heard the witnesses.

As stated in *Carmichael v. Pierce et al.,* 10 Okla. 176, 61 Pac. 583:

"Where the matters involved in a decision of the district court are purely questions of fact, and the jury is wa ved, and the cause submitted to the court, the decision will not be disturbed by this court if the evidence reasonably tends to support the judgment of the court."

The findings of the trial court in that particular were fully sustained by the evidence. The mere fact that Loman was an uneducated, illiterate full-blood Indian, and did not know the value of property or money, would not

of itself make him incompetent to execute the deed. That is not the test of competency. The real test in such a case is: Did he possess sufficient intelligence to understand what he was doing; that is, the effect of his acts? In this case, that he was parting with the particular property he was disposing of, the disposition he was making of it, and the person to whom he was conveying it? The court found that he did, and that finding will not be disturbed by this court.

It is unnecessary to add here that a general finding is a finding of every special fact necessary to sustain the judgment. *Lookabaugh v. Bowmaker*, 21 Okla. 489, 96 Pac. 651; *Roberts v. Markham*, 26 Okla. 387, 109 Pac. 127; *McCann v. McCann*, 24 Okla. 264, 103 Pac. 694.

This brings us to the second contention of counsel for plaintiffs in error, viz.:

"That Loman's allotment was not alienable at the time he deeded it to Hawk, because of the agreement between the United States and the Choctaw and Chickasaw tribes of Indians, of March 21, 1902, and ratified by Act of Congress July 1, 1902 [chapter 1362, 32 Stat. 641], and by a vote of a majority of said Indians on the 25th day of September, 1902, and that the Act of Congress of April 21, 1904 [chapter 1402, 33 Stat. 189], purporting to remove said restrictions, is unconstitutional, for the reason that it is in violation of that part of the fifth amendment of the Constitution of the United States, which provides, that: 'No person shall * * * be deprived of life, liberty, or property, without due process of law.'"

We gather from the foregoing that counsel take the position that, by the original agreement, or treaty, approved by Congress and a vote of the Choctaws and Chickasaws, Loman acquired a vested right forever guaranteeing to him a restriction upon alienation of said

lands.   In other words, a vested right of disability—a new and most peculiar and novel proposition.   The acts of Congress applicable to the subject in hand are as follows:

"All lands allotted to the members of said tribes, except such land as is set aside to each for a homestead as herein provided, shall be alienable after issuance of patent as follows:   One-fourth in acreage in one year, one-fourth in three years, and the balance in five years; in each case from date of patent; provided, that such land shall not be alienable by the allottee or his heirs at any time before the expiration of the Chickasaw and Choctaw tribal governments for less than its appraised value."

That part of the act of April 21, 1904, referred to is:

"And all the restrictions upon the alienation of lands of all allottees of either of the Five Civilized Tribes of Indians who are not of Indian blood, except minors, are except as to homesteads hereby removed, and all restrictions upon the alienation of all other allottees of said tribes, except minors, and except as to homesteads, may, with the approval of the Secretary of the Interior, be removed under such rules and regulations as the Secretary of the Interior may prescribe, upon application to the United States Indian agent at the Union Agency in charge of the Five Civilized Tribes, if said agent is satisfied upon a full investigation of each individual case, that such removal of restrictions is for the best interest of such allottee.   The finding of the United States Indian agent and the approval of the Secretary of the Interior shall be in writing and shall be recorded in the same manner as patents for lands are recorded."

The granting clause in the patent, relied upon by counsel, is as follows:   "Subject, however, to the conditions approved by the act of Congress, approved July 1, 1902."

We cannot agree with counsel in their contentions in that behalf, nor can we agree with counsel that a person may acquire a vested right in that which amounts only to a disability, in this case, simply a restriction upon alienation. Our understanding has always been that the power which has the right to provide a restriction or any inhibition also has the power to remove it. Justice Cooley, in his excellent work on Constitutional Limitations (7th Ed.), at pages 546 and 547, says:

"A citizen has no vested rights in statutory privileges and exemptions. Among these may be mentioned exemptions from the performance of public duties, upon juries, or in the militia, and the like; exemptions of property or person from assessment for the purpose of taxation; exemptions of property from being seized on attachment, or execution, or for the payment of taxes; exemption from highway labor, and the like. All these rest upon reasons of public policy, and the laws are changed as the varying circumstances seem to require."

Besides, this question has been passed upon by this court and also the Supreme Court of the United States. In the case of *Godfrey v. Iowa L. & Tr. Co.,* 21 Okla. 293, 95 Pac. 792, the court, speaking through Justice Williams, says:

"There can be no serious question of the authority of Congress to remove the restrictions upon the alienation of land of the allottees without the consent of the tribe."

The case of *Lone Wolf v. Hitchcock,* 187 U. S. 553, 23 Sup. Ct. 216, 47 L. Ed. 299, is decisive of this case. In that case it is said:

"The power exists to abrogate the provisions of an Indian treaty, though presumably such power will be exercised only when circumstances arise which will not

only justify the government in disregarding the stipulations of the treaty, but may demand, in the interest of the country and the Indians themselves, that it should do so. When therefore treaties were entered into between the United States and a tribe of Indians, it was never doubted that the power to abrogate existed in Congress, and that in a contingency such power might be availed of from considerations of governmental policy, particularly if consistent with perfect good faith towards the Indians."

In *Stephens v. Cherokee Nation,* 174 U. S. 445, 19 Sup. Ct. 722, 43 L. Ed. 1041, quoting from the syllabus of 19 Sup. Ct., it is said:

"An act of Congress may supersede a prior treaty, and the validity of an act cannot be questioned by the courts on the ground that it is in conflict with a treaty between the government and an Indian tribe."

In *Thomas v. Gay,* 169 U. S. 264, 18 Sup. Ct. 340, 42 L. Ed. 740, it is said:

"It is well settled that an act of Congress may supersede a prior treaty, and that any questions that may arise are beyond the sphere of judicial cognizance, and must be met by the political department of the government."

See, also, upon this point, *Choctaw Nation v. U. S.,* 119 U. S. 1, 7 Sup. Ct. 75, 37 L. Ed. 306; *Cherokee Nation v. Hitchcock,* 187 U. S. 294, 23 Sup. Ct. 115, 47 L. Ed. 183.

It would seem that further discussion of this question is unnecessary. The contentions of counsel, while ingenious, and well presented, are untenable, and cannot be sustained, either upon principle or authority.

The third and last contention of counsel for plaintiffs in error is that:

"The court erred in canceling the power of attorney of Charles H. Williams, because in Paullin's petition it showed no ground for cancellation."

The answer to that is that the court had jurisdiction of all the parties, and the subject-matter, and under the rule had the power, and it was its duty, to dispose of all the matters before the court.

.   The case should be affirmed.

By the Court:   It is so ordered.