## STARKS v. JOINES.

No. 12913—Opinion Filed Feb. 5, 1924.

(Syllabus.)

1. **Guardian and Ward—Validity of Appointment of Guardian in Indian Territory—Sale of Land—Collateral Attack.**

S. was granted letters of guardianship of his minor daughter by the clerk of the United States District Court for the Durant Division of the Eastern District of Oklahoma, on October 28, 1907. This vacation appointment had neither been confirmed nor rejected prior to statehood. On October 29, 1907, the guardian filed an inventory of the estate, and in December the county court of Bryan county approved a lease executed by S. on the land of his ward. On March 6, 1909, without any order of confirmation or rejection of the vacation appointment having been made, the guardian filed his petition to sell the land of his ward, and afterward, through regular probate proceedings, the property was sold, the sale confirmed by the county court, and the guardian ordered to execute a deed to the purchaser, which was done. The vacation appointment of S. was legally granted under section 3462, Mansfield's Digest of the Laws of Arkansas, and until such appointment was rejected by the U. S. District Court or its successor, the county court of Bryan county, Okla., the acts of such guardian are not subject to collateral attack.

2. **Indians—Validity of Sale of Minor's Allotment.**

Under the act of Congress May 27, 1908, the only restriction on the sale of the land of a minor allottee of the Five Civilized Tribes of less than half Indian blood was that it should be sold through the probate court, and this act of Congress did not destroy any vested right existing in such

allottee under the provisions of the Atoka Agreement, as the restriction provision of the Atoka Agreement conferred no right, but imposed a limitation, which Congress may change or remove.

Error from District Court, Carter County; Thomas W. Champion, Judge.

Action by Bessie Leola Starks against U. S. Joines. Judgment for defendant, and plaintiff brings error. Affirmed.

Hatchett & Semple, for plaintiff in error.

Wm. G. Davisson, for defendant in error.

COCHRAN, J. Bessie Leola Starks, by her legal guardian, filed this suit to recover the allotment of land which was patented to her as a member of the Choctaw Tribe of Indians. The defendant answered and asserted title to said lands by virtue of a guardianship sale made by the guardian of said minor through the county court of Bryan county, Okla. An agreed statement of facts disclosed that a petition for appointment as guardian of Bessie Leola Starks was filed by T. S. Starks, her father, in the office of the clerk of the United States Court for the Indian Territory, in the Durant Division of the Central District on October 28, 1907. That letters of guardianship were issued in vacation by the clerk of the United States court to T. S. Starks on October 28, 1907, and on the same day guardian's bond was filed by T. S. Starks, and approved. This appointment was not confirmed by the United States court prior to statehood, and upon the advent of statehood the vacation appointment had never been acted upon by the United States court and had neither been confirmed nor rejected. After statehood and about the month of December, 1907, this guardian was recognized by the county court of Bryan county, Okla., by the approval of an agricultural lease executed by said guardian. On October 29, 1907, the guardian filed an inventory of the property of the minor. On March 6, 1909, the guardian filed his petition in the county court of Bryan county, Okla., for authority to sell the lands in controversy, and on April 19, 1919, an order was made by the county court requesting all persons interested to show cause why the petition to sell should not be granted. Thereafter, through regular proceedings, the property was duly sold and the sale confirmed by the county court, and the guardian ordered to execute a deed to the puchaser, which was done.

It is contended by the plaintiff that the appointment of T. S. Starks as guardian, by the clerk in vacation, is void for the reason that such appointment was never confirmed by the court under whom the clerk

was authorized to act, and the appointment, not having been confirmed prior to statehood, became a nullity after statehood. This appointment was made under authority found in sections 3461 and 3462, Mansfield's Digest of the Laws of Arkansas, which were in effect at that time, and the effect to be given to the vacation appointment is to be determined by the provisions of that statute as construed by the Supreme Court of Arkansas. Section 3461, provides:

"The court of probate shall have power to appoint guardians for minors, and possess the control and superintendence of them."

Section 3462, provides:

"The clerk of the court of probate, either in person or by deputy, shall in vacation have power to grant letters of guardianship subject to the confirmation or rejectment of the court."

In Knott v. Clements, 13 Ark. 335, the court in passing on the effect of an unconfirmed vacation appointment said:

"The statute conferring power on the clerk of the probate court to grant letters in vacation, provides that they shall be subject to the approval or rejection of the court, and unless it is shown that the court rejected the letter so granted, the mere acquiescence of the court in the acts of its officer in vacation should be taken as an affirmance of such acts, and so in legal effect the letters, although purporting upon their face to have been issued by the clerk in vacation, are in fact a grant by the court."

In Shumard v. Phillips (Ark.) 13 S. W. 510, the court said:

"The clerk of the probate court at the time indicated, as now, was authorized to appoint guardians in vacation, subject to the approval of the court. Mansf. Dig. par. 3462. When letters of guardianship are issued by the clerk, and a bond is filed with him, the person to whom the letters issue is authorized to enter upon the discharge of the duties of guardian; and as was said by Judge Walker in delivering the opinion of this court in Knott v. Clements, 13 Ark. 335, the letters so issued must be regarded as legally granted until it is shown that they have been rejected by the court; the silent acquiescence of the court in the action of the clerk in vacation being taken as confirmation of the letters issued by him, as against collateral attack upon the guardian's authority."

It is true that the clerk of the court is essentially a ministerial officer and cannot, without express statutory authority to that effect, exercise any judicial function, and the court, in the absence of statutory authority, has no power to delegate such matters to the clerk, but the statute of Arkansas specifically granted to the clerk the authority to make a vacation appointment, and under such appointment the guardian had authority to perform all acts which could be performed by guardian appointed by order of the court, and the Supreme Court of Arkansas in the cases cited held that the letters of guardianship must be treated as legally granted until rejected by the court. In the instant case the letters of guardianship granted to T. S. Starks were never rejected by the United States district court nor by its successor, the county court of Bryan county, Okla., but the county court of Bryan county, Okla., acquiesced in the appointment of the guardian and recognized it and permitted the sale of the real estate in controversy, and it is our opinion that the validity of the appointment cannot be attacked in this collateral proceeding.

It is next contended that the county court of Bryan county, Okla., was without power to order a sale of the land involved in this case for the reason that said lands were the individual allotment of Bessie Leola Starks and were inalienable under the provisions of the Original Atoka Agreement. The land in controversy was a portion of the allotment of the plaintiff as a member of the Choctaw Tribe of Indians and was sold during the minority of the plaintiff by her legal guardian after the act of Congress May 27, 1908, became effective. Counsel for the plaintiff recognizes that this court in Jefferson v. Winkler, 26 Okla. 653, 110 Pac. 755, and Allison v. Crummey, 64 Okla. 20, 166 Pac. 691, held that this act removed all restrictions on alienation of mixed-blood Indians, having less than one-half Indian-blood, except the requirement that such lands belonging to minor allottees should be sold through the proper probate court, but it is insisted that Congress had no authority to authorize the sale of the lands belonging to allottees of the Choctaw Nation during the minority of such allottee. It is contended by counsel for the plaintiff that this court in deciding the above cases overlooking the provision of the Atoka Agreement that the lands of minors should not be sold during minority and determined those cases as though the restriction which theretofore existed was imposed by an act of Congress instead of a condition of a treaty provision entered into between the Choctaw Tribe of Indians and the United States government. It is contended that the treaty entered into between the United States and the Choctaw and Chickasaw Indians is a contract which Congress cannot alter or modify so as to permit the alienation of land which was restricted under the treaty provisions and would yet remain re-

stricted but for the various acts of Congress attempting to remove restrictions from the alienation of such lands. Prior to the ratification of the Atoka Agreement the Choctaw and Chickasaw Indians owned their land in common; for a number of years the federal government endeavored to induce the tribes residing in the Indian Territory to abandon the common ownership of land and accept individual allotments. In 1897 the Atoka Agreement was ratified, and this agreement was incorporated into the Curtis Act of June 28, 1898, and was modified by the act of July 1, 1902. These two acts are commonly known as the Atoka Agreement and the Supplemental Agreement, and provided for the allotment to each member of the tribe of his share of the land which had theretofore been held in common. Section 29 of the Atoka Agreement provides:

"That each member of the Choctaw and Chickasaw freedmen, shall where it is possible, have the right to take his allotment on land, the improvements on which belong to him, and such improvements shall not be estimated in the value of his allotment. In case of minor children, allotments shall be selected for them by their father, mother, guardian, or the administrator, having charge of their estate, preference being given in the order named and shall not be sold during his minority. Allotments shall be selected for prisoners, convicts, and incompetents by some person akin to them, and due care taken that all persons entitled thereto have the allotments made to them."

The next paragraph of this Agreement is as follows:

"All lands allotted shall be nontaxable while the title remains in the original allottee, but not to exceed twenty-one years from date of patent, and each allottee shall select from his allotment a homestead of one hundred and sixty acres, for which he shall have a separate patent, and which shall be inalienable for twenty-one years from date of the patent. This provision shall also apply to the Choctaw and Chickasaw freedmen to the extent of his allotment. Selections for homesteads for minors to be made as provided herein in case of allotment, and the remainder of the lands allotted to said members shall be inalienable for a price to be actually paid, and to include no former indebtedness or obligation— one-fourth of said remainder in one year, one-fourth in three years, and the balance of said alienable lands in five years from the date of the patent."

Section 11 of the Supplemental Agreement reads as follows:

"There shall be allotted to each member of the Choctaw and Chickasaw Tribes, as soon as practicable after the approval of the Secretary of the Interior of his enrollment as herein provided, land equal in value to three hundred and twenty acres of the average allottable land of the Choctaw ad Chickasaw Nations."

Section 12 provides:

"Each member of said tribe shall, at the time of the selection of his allotment, designate as a homestead out of said allotment land equal to the value of one hundred and sixty acres of the average allottable land of the Choctaw and Chickasaw Nations, as nearly as may be, which shall be inalienable during the lifetime of the allottee, not exceeding twenty-one years from the date of certificate of allotment, and a separate certificate and patent shall issue for said homestead."

Section 15 provides:

"Lands allotted to members and freedmen shall not be affected or encumbered by any deed, debt or obligation of any character contracted prior to the time at which said land may be alienated under this act, nor shall said lands be sold except as herein provided."

Section 16 provides:

"All lands allotted to the members of said tribes, except such as is set aside to each for a homestead as herein provided, shall be inalienable after issuance of patents as follows: One-fourth in acreage in one year, one-fourth in acreage in three years, and the balance in five years; in each case from date of patent; Provided, that such land shall not be alienable by the allottee or his heirs at any time before the expiration of the Choctaw and Chickasaw tribal governments for less then its appraised value."

By a series of acts beginning with the act of April 21, 1904, Congress undertook to remove restrictions placed upon certain classes of allottees by the allotment agreements above referred to, and in some instances restrictions were extended beyond the date to which restrictions had been originally imposed by said agreements. These various acts of Congress are commonly referred to as the act of April 24, 1904, act of April 21, 1906, and the act of May 7, 1908. Section 1 of the act of May 27, 1908, provides:

"That from and after 60 days from the date of this act the status of the lands allotted heretofore or hereafter to allottees of the Five Civilized Tribes shall, as regards restrictions on alienation or incumbrance, be as follows: All lands, including homesteads, of said allottees enrolled as intermarried whites, as freedmen, and as mixed-blood Indians having less than half Indian blood including minors shall be free from all restrictions. All lands, except homesteads, of said allottees enrolled as mixed-blood Indians having half or more than half and less than three-quarters Indian blood, shall be free from all restrictions. All homesteads of said

allottees enrolled as mixed-blood Indians having half or more than half Indian blood, including minors of such degrees of blood, and all allotted lands of enrolled full-bloods, and enrolled mixed-bloods of three-quarters or more Indian blood. including minors of such degrees of blood, shall not be subject to alienation, contract to sell, power of attorney, or any other incumbrance prior to April twenty-sixth, nineteen hundred and thirty-one, except, that the Secretary of the Interior may remove such restrictions."

Plaintiff contends that the foregoing section did not remove the restriction imposed by the Original Atoka Agreement, and especially that portion of section 29 which provides:

"In the case of minor children, allotments shall be selected for them by their father, mother, guardian, or the administrator having charge of their estate. preference being given in the order named, and shall not be sold during his minority."

If the contention of the plaintiff is correct, not only can the allotment of no member of the Five Civilized Tribes be sold during his minority, but no sale could be made of an allotment except where the period of limitation, prescribed in the treaty agreements has expired. Plaintiff relies on the case of Choate v. Trapp, 224 U. S. 665, 56 L. Ed. 945, in which it was held that the allottees acquired a vested right, under the provisions of the Atoka Agreement, which provided that the allotment should be nontaxable for a period of 21 years, and that Congress had no power by subsequent acts to deprive the allottee of that property right, but a consideration of the entire opinion discloses that a distinction was made between the vested property right acquired under the nontaxable provision of the treaty agreement and the restrictions on alienation imposed in the agreement. It will be observed that the court held against the authority of Congress to tax the allotments, not on the theory that Congress did not have authority by subsequent acts to repeal or change the provisions of the treaty agreement, but based its decision on the principle that the individual allottee had a vested property right by reason of the nontaxable agreement which could not be destroyed by the subsequent act of Congress. The court said:

"There are many cases, some of which are cited in the opinion of the Supreme Court of Oklahoma (Thomas v. Gay, 169 U. S. 264, 271; Lone Wolf v. Hitchcock, 187 U. S. 553, 565) recognizing that the plenary power of Congress over the Indian Tribes and tribal property cannot be limited by treaties so as to prevent repeal or amendment by a later statute. The tribes have been regarded as dependent nations, and treaties with them have been looked upon, not as contracts, but as public laws which could be abrogated at the will of the United States. This sovereign and plenary power was exercised and retained in all the dealings and legislation under which the lands of the Choctaws and Chickasaws were divided in severalty among the members of the tribes. For, although the Atoka Agreement is in the form of a contract, it is still an integral part of the Curts Act, and, if not a treaty, is a public law relating to tribal property, and as such was amendable and repealable at the will of Congress. But there is a broad distinction between tribal property and private property, and between the power to abrogate a statute and the authority to destroy rghts acqured under such law. Reichert v. Felps, 6 Wall. 160. The question in this case, therefore, is not whether the plaintiffs were parties to the Atoka Agreement, but whether they had not acquired rights under the Curtis Act which are now protected by the Constitution of the United States."

Further in the opinion the court deals with the identical question which is now presented for our consideration, and distinguishes between the right acquired under the nontaxable agreement and the provisions imposing restrictions against alienation, and uses the following language:

"On the part of the state it is argued that there was, in fact, no tax exemption, but that that provision was only intended to guard absolutely against alienation of the land, whether for taxes, or at judicial sale. so that when the restrictions against alienation were removed by the act of 1908, the provision as to nontaxability went as a necessary part thereof. But the exemption and nonalienability were two separate and distinct subjects. One conferred a right and the other imposed a limitation. The defendant's argument also ignores the fact that. in this case, though the land could be sold after five years, it might remain nontaxable for 16 years longer, if the Indian retained title during that length of time. Restrictions on alienation were removed by lapse of time. He could sell part after one year. a part after three years, and all except homestead after five years. The period of exemption was not coincident with this five year limitation. On the contary, the privilege of nontaxability might last for 21 years, thus recognizing that the two subjects related to different periods and that neither was dependent on the other. The right to remove restrictions was in pursuance of the power under which Congress could legislate as to the status of the ward and lengthen or shorten the period of disability. But the provision that the land should be nontaxable was a property right, which Congress undoubtedly had the power to grant. That right fully vested in the Indians and was binding upon Oklahoma."

In Williams v. Johnson, 32 Okla. 247, 122 Pac. 485, the court said:

"It is apparent that there is a direct conflict between these two acts of Congress, and the question, therefore, necessarily arises, Which act shall control? or, rather, Has Congress the power to alter, amend, or modify, by a subsequent act of Congress, the provisions of a treaty with the Five Civilized Tribes of Indians? In the case at bar, Congress, by virtue of the former act, which was in effect a treaty between the Choctaws and Chickasaws on the one side, and the United States on the other, and which was ratified by both Congress and the tribes, provided that the land allotted should be inalienable, except as provided in section 16 thereof. Two years later, by an independent act, without the assent of the Choctaw and Chickasaw Nations, Congress provided that the removal of restrictions from all lands except minors and except as to homesteads may, with the approval of the Secretary of the Interior, be effected under such rules and regulations as the Secretary of the Interior may prescribe, upon application to the United States Indian Agent at the Union Agency, etc. If Congress has such power to alter, amend, or modify the provisions of a treaty with the Five Civilized Tribes of Indians, then the judgment of the lower court in the case at bar is correct, but, if Congress has no such power, the judgment is wrong, and must be reversed. The parties to this action concede this to be the test, and agree that the answer to the question will be decisive of this case. Without doubt the Congress of the United States has full authority to treat with the subject-matter of these two acts, to wit, the alienation of Indian allotments, as its judgment may direct, and in that particular the will of Congress is supreme, and is not a subject for the consideration of the courts."

After quoting from Godfrey v. Iowa Land & Trust Co., 21 Okla. 293, 95 Pac. 792, Wadsworth v. Boysen, 148 Fed. 771, Ward v. Race Horse, 163 U. S. 504, Tiger v. Western Inv. Co., 221 U. S. 286, and other cases, the court in Williams v. Johnson, supra, concluded:

"As has been seen, Congress, from the beginning, has exercised a supervisory care over the persons and the estates of the Indians, and this being a political power, it remains for Congress in the exercise of its discretion and wisdom to say what the policy of the government shall be when dealing with these dependent people. By the act of April 21, 1904, it was deemed expedient to remove the restrictions as to alienation of lands from all except as to minors, and as to homesteads, subject to certain requirements, provided for in said act. Whether or not this was a wise provision is not a question for the courts. * * * Congress, as we have seen, had the undoubted right and authority to alter, amend, or modify, by subsequent legislation, the provisions of any treaty or agreement made with any tribe of Indians."

The opinion in the foregoing case was followed in Short v. Oliver, 46 Okla. 683, 148 Pac. 709. In Loman et al. v. Paullin, 51 Okla. 294, 152 Pac. 73, the court said:

"We gather from the foregoing that counsel take the position that, by the original agreement, or treaty, approved by Congress and a vote of the Choctaws and Chickasaws, Loman acquired a vested right forever guaranteeing to him a restriction upon alienation of said lands. In other words, a vested right of disability—a new and most peculiar and novel proposition. * * * We cannot agree with counsel in their contentions in that behalf, nor can we agree with counsel that a person may acquire a vested right in that which amounts only to a disability, in this case, simply a restriction upon alienation. Our understanding has always been that the power which has the right to provide a restriction or any inhibition also has the power to remove it." * * *

In McIntosh v. Dill, 81 Okla. 1, 205 Pac. 917, this court again passed upon the authority of Congress to supersede provisions of a treaty agreement with the Indians, and said:

"An act of Congress may supersede a treaty even with a foreign nation, and an Indian treaty is held to be of less dignity than is a treaty with a foreign nation. See Edye v. Robertson, 112 U. S. 580, 5 Sup. Ct. 247, 28 L. Ed. 798, and the authorities cited in the case just previously cited and the same page and the one following. The plentitude of the powers of Congress and the supervisory powers over the Indians is discussed in the case of Stephens v. Cherokee Nation, 174 U. S. 445, 19 Sup. Ct. 722, 43 L. Ed. 1041."

The court in this same case also held that a restriction on alienation is not a property right, and uses the following language:

"We know of no constitutional inhibitions on the powers of Congress to pass such an act and validate this proceeding. How can it be held that a restriction on alienation is a property right? We may well ask. How can any person have a vested right in a denial of a right—a limitation of a right? * * * The reason this plaintiff did not have full power to convey was due to the will of Congress, and Congress willed subsequently to withdraw the inhibition Congress, instead of undertaking to validate the prior proceedings, could have declared the restrictions removed, as it did do, and, by the exercise of its legislative fiat, and in pursuance of its ample powers, could have decreed the title in the purchasers. * * *"

The rule announced in the foregoing case has been folowed in the recent case of Johnson v. Furchbar, 96 Okla. 114, 220 Pac. 612, in which case this court in the 8th paragraph of the syllabus held:

"Under the act of May 27, 1908, the only restriction on the sale of the land of a minor Creek freedman was that it should be sold through the probate court, and this act of Congress did not destroy any vested right existing in the allottee under the provisions of the Original Creek Agreement."

We can add nothing to what has already been said in the foregoing cases, and it is our opinion that the allottee had no vested property right in the restriction on alienation provided in section 29 of the Atoka Agreement, and that Congress had the authority to repeal this provision, which was done by the act of May 27, 1908, and that the land in controversy was alienable on the date of its sale. The judgment of the trial court is affirmed.

JOHNSON, C. J., and NICHOLSON, MASON and LYDICK, JJ., concur.