WILLIAM H. WALDRON v. WINFIELD S. ANGLEMAN.

Argued February 23, 1904—Decided July 30, 1904.

1. In order to establish intoxication as a defence at law in cases of contract, it must appear that the intoxication of the person whose competency is challenged was so far complete that he would be unable to understand the nature and effect of the act in which he was engaged and the business he was transacting.
2. Under the early English practice a *retraxit*, the effect of which would be to forever end the litigation, could·be entered only by the plaintiff in person, in open court, and not by attorney; by analogy, under the present practice, when the validity of such a document is challenged by the plaintiff from whom it was obtained, its legality, both in form and execution, will be the · object of careful judicial scrutiny.

---

On rule to show cause why a *retraxit* should not be set aside.

Before Justices HENDRICKSON and PITNEY.

For the motion, *Horace Codington* and *Francis Lafferty*.

*Contra, Winfield S. Angleman, pro se.*

The opinion of the court was delivered by

HENDRICKSON, J.   This is a rule to show cause why a *retraxit,* purporting to have been executed by the plaintiff, and later filed with the clerk, should not be set aside as having been improvidently and unjustly obtained. The defendant is one of the attorneys of the court and the plaintiff

a former client of his. The action is for the recovery of $500, collected by the attorney from the Public Service Corporation in settlement of a suit for damages growing out of a trolley accident. The affidavits taken under the rule show that of the amount collected the defendant paid to the plaintiff $125, which was the one-fourth part thereof, taking a receipt, however, for the whole amount of $500. The receipt was silent as to how the balance of $375 was to be appropriated.

Other facts developed by the affidavits are that the venue in the present case was laid in Union county; that it had been noticed for trial at the October Term, 1903; that it was not then tried because of the illness of the presiding justice; that on December 8th, 1903, the attorney of plaintiff learned for the first time, by a letter from the defendant, that on the 6th of the preceding month the latter had obtained the *retraxit* in question. Notwithstanding the notification, the attorney of plaintiff noticed the cause for January Term succeeding, when the *retraxit* appearing as part of the record sent down, this rule was obtained from the presiding justice. The principal ground upon which the validity of the *retraxit* is challenged is that it was obtained from the plaintiff while he was so much intoxicated that he was incompetent to transact business. Under the early English law voluntary intoxication was held to be no defence against the enforcement of a contract, on the ground that the man should not be allowed to stultify himself. *Co. Litt.* 247*a*; 2 *Kent Com.* 451. But this rule was modified later, so that in the case of *Pitt* v. *Smith,* 3 *Campb.* 33, Lord Ellenborough permitted the question to be asked whether the defendant was not actually in a state of complete intoxication at the time he executed the agreement, and observed that "there was no agreement between the parties, if the defendant was intoxicated in the manner supposed when he signed the paper. He had not an agreeing mind." Following this line of decisions, Justice Drake, speaking for the court in the early case of *Burroughs* v. *Richman,* 1 *Gr.* 233, affirmed the admission of a similar question, remarking "that sound policy required the limitation of such defence to a case where the intoxication

was brought about by the other party, or unless it was so total as to be palpable evidence of fraud in the person entering into a contract with one so intoxicated." The learned justice recognized a more liberal rule when recourse was had to a court of equity.

That rule is, as declared by our courts of equity, that in order to avoid a contract for such cause it must be shown either that the intoxication was produced by the act or connivance of the person against whom the relief is sought, or that an undue advantage was taken of his situation. *Warnock* v. *Campbell,* 10 *C. E. Gr.* 485; *O'Conner* v. *Rempt,* 2 *Stew. Eq.* 156. Drunkenness is frequently characterized by law writers as temporary insanity. And we think the rule of competency, as applied generally in cases of mental aberration, may be applied in cases of intoxication. As stated in 17 *Am. & Eng. Encycl. L.* (*2d ed.*) 400, "so far as legal capacity is concerned, it is immaterial from what causes such a state of mind arises, whether by the party's own improvidence or otherwise. It is the state and condition of the mind itself that the law will notice, and not the causes that produced it." The test of capacity to make a deed has been laid down by this court as requiring that the grantor "shall have the ability to understand the nature and effect of the act in which he is engaged and the business he is transacting." *Eaton* v. *Eaton,* 8 *Vroom* 108. While this doctrine is there laid down with reference to cases of insanity or mental imbecility, we think it may also extend to cases of intoxication. In 17 *Am. & Eng. Encycl. L.* (*2d ed.*) 399, the test of incapacity to make a binding contract because of intoxication is stated to be that degree of intoxication which disqualifies the mind to comprehend the subject of the contract, its nature and probable consequences. It is true that it is added, as part of the paragraph, that it has been said that the defence of intoxication is not favored. We agree that such a defence is perhaps peculiarly liable to abuse, and that it should always be subjected to careful judicial scrutiny. But, none the less, the test of capacity, as thus stated in the text, is in accord with the rule laid down in *Eaton* v. *Eaton, supra,* and is

applicable, we think, to cases of incompetency arising from intoxication.

Other facts appearing by the affidavits are these: On the evening of the day in question, between six and seven, the plaintiff was on his way from his house, in the borough of North Plainfield, to take the trolley to Dunellen, three or four miles away, to visit his married daughter, with whom his wife was then staying. As he was passing a building where the defendant had his office he was accosted by the defendant, and after some conversation relative to the suit went with him to his office, where an alleged settlement of the suit took place, the plaintiff receiving a consideration of $35 in cash and executing therefor a release in writing, and also the *retraxit.* The parties were alone at the time. The plaintiff was of dissipated habits as to drink and had been for years. This was election week and he had been on a long debauch. That afternoon he had spent with a neighbor whose wife was a half-sister to his wife. He was assisting his brother-in-law in some light work and drank heavily of hard cider. He left there about four o'clock, and as the witnesses stated was quite intoxicated at the time; was unsteady in his walk; talked, as he generally did when full, showing loss of memory and repeating the same thing over and over. They also testified that they considered him incompetent to transact business. The brother-in-law also saw him on the street the next morning at eight, and described his condition as to intoxication as being about the same as it was the afternoon before. Between eight and nine o'clock the evening of the 6th, he was at Dunellen, at the house of his son-in-law. His condition then was, as described by the latter and by the plaintiff's wife, as pretty full, very drunk, and staggering so that he had to be helped down the stairs and out of the house when he went away. He asked his son-in-law to go to a saloon near by and get a drink. The latter declined and the plaintiff went away alone. He was described as talking much and in a foolish manner, and as being incompetent to transact business. A boarder at plaintiff's house saw the latter the evening of the 6th about half-

past five, and says he was then quite under the influence of liquor; staggered a little as he walked, made an attempt to eat but did not eat anything, and left the house about quarter after six to go to Dunellen; that upon his return from there, about eleven o'clock, he was in a great deal worse condition than when he went; that he left plaintiff in kitchen when the witness retired; that he did not hear him go to bed; that the next morning, about half-past six, he saw plaintiff there, in the same condition as the night before; that he then had ten or twelve bottles of beer and offered witness a drink; that plaintiff's condition was such on the night of November 6th and the morning of the 7th that witness would not consider him capable of doing business. An unmarried daughter testified that she saw her father at home on the 6th at half-past five, and when he started to go to Dunellen and also the next morning; that he was intoxicated at these times; that she thought he had liquor about the house all day, and that he was a little worse intoxicated on the morning of the 7th. The plaintiff himself was a witness, and was sober at the time. We are impressed with his fairness as a witness and with an apparent disposition on his part to tell the truth. It should be stated that on the morning after the release and *retraxit* were signed, as the defendant testified, the plaintiff came again to his office, and that defendant prepared an affidavit, setting forth the terms of the alleged settlement, the signing of the release and *retraxit,* and stating "that all these acts of his [Waldron's] have been done without any compulsion, duress or coaxing of any kind whatever, from any person whatever;" and that he had not seen the plaintiff's attorney of record within a year last past (about); and that he never authorized anyone else to see the said attorney for him or on his behalf; and that he greatly regretted the unauthorized action of the said attorney in bringing the suit. It further appears that during the writing of the affidavit a master in chancery happened to come in, who, as the defendant testifies, swore the plaintiff to the affidavit and took his acknowledgment to the release and *retraxit* that were signed the night before.

The plaintiff testified that during the week prior to these occurrences, and for a month previous thereto, he had been drinking whiskey, beer and cider to excess, and that during that period he had done nothing of a business nature—that is, nothing that he would call "straight business;" that he remembers very little when he is drinking; that he had some recollection of meeting defendant and being at his office on the evening in question, and of receiving money and signing some paper, but the details of conversations he could not give, nor could he remember the amount he received. He also recalled the fact that he was at defendant's office the next morning, and observed a gentleman come in, whom he could not recognize at the hearing. He had no recollection of having been sworn to the affidavit. When asked what had been said to him by the other gentleman, his answer was, "I don't think he spoke to me;" he further said he did not remember the gentleman reading to him a paper and asking if he had signed it; he thought the gentleman had not done so. He was subjected to severe cross-examination, the defendant first reading to him the statute defining the crime of perjury and prescribing its punishment, but the witness' evidence as given on the direct examination was not perceptibly weakened.

The defendant offered himself and the master who took the acknowledgments, but called no other witnesses. Their evidence was flatly to the effect that on the occasions referred to the plaintiff was sober. The master may not have had a full opportunity to observe the plaintiff's condition and he may not have known of his habits as to intoxication. But in view of all the testimony we are convinced that the plaintiff was intoxicated on the occasion in question, and according to the clear weight of the evidence the defendant must be held to have known it. In weighing the evidence we have made due allowance for the fact that a number of plaintiff's witnesses were connections of his, and to that extent were interested witnesses. But at the same time we must recognize the fact that the defendant is also interested, as a party to the suit, and because his professional character might suffer by a trial of the cause. He testified that his retention of

seventy-five per cent. of the amount collected, although the suit was settled without a trial, was by virtue of an agreement with the plaintiff, made when he took the case, that he should have for his compensation seventy-five per cent. of the amount he should recover. We must have regard, in that matter, to the fact, which must have been known to the defendant as an active practitioner, that the act of reserving, or contracting to reserve, from the fruits of an accident suit as compensation so large a share of the damages to be recovered is liable to be regarded by the courts with suspicion, and as unconscionable in character. *Lynde* v. *Lynde,* 19 *Dick. Ch. Rep.* 736, 749, and cases cited; *Schomp* v. *Schenck,* 11 *Vroom* 195, 200. See, also, the opinion of the Chancellor in Weller & Lichtenstein *v.* Meffert, decided June, 1904.

The case also shows that the defendant knew that the plaintiff had long been subject to the habit of intoxication. Upon cross-examination, the defendant was asked—

"*Q.* Isn't it true that you knew from the beginning that Mr. Waldron was a drinking man?

"*A.* Of course."

He knew, also, that Mrs. Waldron had charge of his important concerns. She first sought his services in the suit to recover the plaintiff's damages. She was present when the $125 was paid over and took possession of the money. He also knew she was the manager of the husband's suit against him. The plaintiff's attorney also resided in the borough of North Plainfield, and was within easy reach of the defendant. The fact that the defendant ignored both the plaintiff's wife and also his attorney in this effort to settle the suit, is another circumstance to be considered in weighing the evidence before us. Another circumstance to be considered is this—would the plaintiff, in his sober moments, have gone to the defendant, without the advice of his own attorney or of his wife, and have settled the action for a sum so trifling, a sum that would barely pay the taxed costs of the suit?

We are not concerned in this case with the legal *status* of the alleged settlement or of the release supposed to evidence

the same. They are matters that may be considered upon a trial of the merits. We have to deal with the alleged *retraxit.* The word itself, taken from the Latin, conveys to those unfamiliar with that language no signification of its object or aim. It differs from a nonsuit in that when once entered by a plaintiff upon the record the *retraxit* forever puts an end to the pending suit, as well as the cause of action involved. It was by reason of its far-reaching effect that in the early English practice, in order to enter a *retraxit,* the party himself must appear in person and do so in open court; he could not do so by attorney. 2 *Sell. Pr.* 46; 3 *Bl. Com.* 296; 18 *Encycl. Pr. & Pl.* 898. By analogy we think, under the present practice, the court should carefully scrutinize the circumstances surrounding the execution of such a document, when its validity is challenged, and see that it has been done in conformity to law. And we conclude, after a careful consideration of all the evidence, that under the test of competency above enunciated the plaintiff was not, by reason of his intoxication, competent to execute the *retraxit* at the time he did so, and that in obtaining it undue advantage was taken of his condition at the time. The result is that the rule will be made absolute and the *retraxit* set aside, with costs.