## MILLER et al. v. HOWARD et al.

No. 10177—Opinion Filed Sept. 30, 1919.

Rehearing Denied Nov. 4, 1919.

(Syllabus by the Court.)

**1. Appeal and Error—Evidence—Review.**

In an equitable action, the judgment of the trial court will not be set aside unless it is clearly against the weight of the evidence.

**2. Same—Harmless Error.**

The action of the trial court in excluding a letter offered in evidence is not reversible error where the record shows that a copy of the letter was read to the witness who received it and said witness testified to the correctness of its wording.

**3. Cancellation of Instruments — Deeds — Mental Capacity.**

In an action to set aside a deed on account of the mental weakness of the grantor, the test which is applied is the same as in other forms of mental derangement, namely, that the deed or contract is voidable if the person, at the time of its execution, was so far under the influence of intoxication as to be unable to understand the nature and consequences of his act and unable to bring to bear upon the business in hand any degree of intelligent choice and purpose.

**4. Same—Evidence—Sufficiency.**

Evidence in this case examined, and held not to meet this requirement.

**5. Same.**

All the evidence in the case examined, and the judgment of the trial court held not to be clearly against the weight thereof.

Error from District Court, Creek County; Ernest B. Hughes, Judge.

Action by Ambrose Miller and another against O. R. Howard and another to cancel a deed. From judgment for defendants, the plaintiffs bring error. Affirmed.

W. H. Kornegay and C. N. Simon, for plaintiffs in error.

W. D. Abbott and Poe & Lundy, for defendant in error O. R. Howard.

RAINEY, J. On October 31, 1914, Ambrose Miller, an enrolled member of the Creek Nation, of one-eighth Indian blood, entered into a written agreement with O. R. Howard to convey to the said O. R. Howard, for and in consideration of the sum of $28,000.00, an undivided one-half interest in and to his allotment of land in Creek county, Oklahoma, consisting of 162.85 acres. By the terms of the agreement $500.00 was to be paid upon execution and delivery of the contract, $12,000.00 to be paid in cash on or before five days from the date thereof, and the remaining $15,500.00 was to be payable "only out of the said oil as the same is produced, run, and sold." Pursuant to other terms of the contract Ambrose Miller and his wife, Alice Miller, executed to O. R. Howard a warranty deed conveying an undivided one-half interest in and to said land, which was placed in escrow in the National Bank of Commerce of Tulsa, Oklahoma, to be delivered to O. R. Howard when the $12,000.00 provided by the agreement was paid to

Miller and his wife. The contract further provided that the $12,000.00 to be paid by Howard at the bank should be applied on any and all outstanding liens or incumbrances which might be found to exist, to the end that the undivided one-half interest in the land agreed to be conveyed should be free and clear of all liens or incumbrances whatsoever, except an oil and gas mining lease on said property then being operated by C. B. Schafer. The deed was delivered to Mr. Howard pursuant to said contract and placed of record by him. On June 31, 1917, thereafter, this action was instituted by Ambrose Miller and Alice Miller, his wife, to set aside and cancel said deed, on the ground of fraud. Plaintiffs' petition alleged, in substance, that through the long use of intoxicating liquors Ambrose Miller's mind had become so weakened that he did not realize his allotment had become valuable and did not appreciate the value of money or the value of property, so that he would sign any papers or do anything for any one in whom he had confidence or to get money or whiskey; that the defendant, Howard, knew the value of said land and the plaintiff's weakness and had gained plaintiff's confidence; that for the purpose of securing the land for an inadequate consideration Howard entered into a conspiracy with Dr. Fred S. Clinton, the family physician of the plaintiff, to procure an undivided one-half interest in said land for an inadequate consideration; that pursuant to said conspiracy and while Ambrose Miller was in an intoxicated condition, Howard secured the contract of October 31, 1914; that during the transactions for the sale of said land Miller's mind was in such a weakened condition, on account of the use of intoxicating liquors, that he did not know what he was doing; and that plaintiff's wife, Alice Miller, signed the deed and contract because of fear of her life at the hands of her husband. It was further alleged that for the purpose of further defrauding the plaintiffs, defendant Howard conspired to secure the $15,500.00, payable to them out of the royalties produced from said land; that pursuant to said conspiracy, and while the said Ambrose Miller was in an intoxicated condition and while his mind was so weakened by the use of intoxicating liquors that he did not know what he was doing, O. R. Howard and Dr. Fred S. Clinton induced the plaintiff to sign a release of said royalties for the sum of $5,000.00 in cash. The petition also alleged that Fred S. Clinton claimed some right, title, or interest in and to the land by virtue of the Howard deed, asked that he be required to set out what interest he claimed, and that the same be declared to be null and void. The prayer was for a cancellation of the contract and deed, and for an accounting.

The defendant, Howard, by way of answer, denied that he had entered into a conspiracy with Fred S. Clinton or Paul Clinton to procure the plaintiff's allotment; denied that they, or either of them, were his agents, and denied that Ambrose Miller was intoxicated at the time he executed the contract and deed sought to be cancelled. The answer affirmatively alleged that at the time of entering into said contract and at the time of the execution of said deed the said Ambrose Miller was sober and was competent to understand the nature and character of the transactions, and that Miller knew the value of said land so far as an ordinary mind could know the value thereof. The defendant further alleged that he had carried out all the terms of said contract, and that the plaintiffs had ratified the same and had never complained of the transactions until the 31st day of June, 1917, when the petition was filed in this action. The defendant also alleged in his answer that on or about the 8th day of February, 1915, Miller approached him and entered into negotiations with him for the sale of the prospective royalties and that they finally entered into a written contract for the sale of said prospective royalties for a cash consideration of $5,000.00, which the defendant paid.

The cause was tried to the court without a jury. At the conclusion of the trial the court made findings of fact in favor of the defendants and denied the relief asked by the plaintiffs. These findings are as follows:

"The Court: I have waited patiently through this entire case to find what connection, if any, it was going to be shown that Dr. Clinton had with this deal. There has been nothing in the testimony that has impressed me at all that he had any connection whatever with the deal between Ambrose Miller and Mr. Howard. It may be that he had some interest in what Paul Clinton was receiving and that he was at the office of Mr. Abbott and Mr. Howard on the night this deal was consummated for the purpose of obtaining that. That may have been his purpose in coming there. So far as the testimony here is concerned, there is nothing that impresses me that he had anything to do with the deal.

"Now this contract is sought to be set aside—two contracts are sought to be set aside, the first contract dated October 31, 1914, and the second contract of February

8, 1915, on the ground of fraud. It is alleged that the plaintiff's mind had become weakened by drink. It is alleged that the weakened condition of the plaintiff's mind was caused by the acts and procurement of the defendant.

"There is nothing in this testimony that would induce me at all to find that Paul Clinton ever at any time acted as the agent of Howard. There is nothing in this testimony to show who gave Ambrose Miller the whiskey on which he had been accustomed to getting drunk. About the only thing I can recall, the only time he ever testified to where he got any whiskey was that he got it out of his pocket after he had stepped out of the room; but suffice it to say that the testimony wholly fails to establish the allegation that O. R. Howard ever at any time had anything to do with furnishing liquor to the plaintiff.

"Now these two contracts are sought to be set aside primarily on account of the drunkenness and weakened condition of the plaintiff. Mr. Elliott in his work on Contracts lays down three propositions or conditions on which contracts in cases of this kind can be set aside: The first, where the drunkenness of the person seeking to set aside the contract is caused by the act or procurement of the opposite party; second, where the person seeking to set aside the contract was drunk at the time of the execution of the same and that undue advantage was taken or fraud or undue influence was practiced upon him so as to induce him to execute the contract; and third, where the mind and understanding of the person seeking to set aside the contract are impaired to such extent that he is unable to understand the nature and consequences of his acts and the result and magnitude of the transaction. As to the first, there is absolutely no proof to establish that the plaintiff was drunk by the act or procurement of the defendant, so that does away with that proposition. As to the second proposition, the testimony does show that at the time of entering into this contract and for a long time prior to entering into this contract the plaintiff was addicted to the use of intoxicating liquors to excess; and I further find from the testimony that at the time these contracts were entered into his mind had become somewhat weakened by the long continued use of alcoholic liquors. Now if his mind was weak at that time, from the use of intoxicating liquors, and the defendant knew it or had reason to know it and he took any undue advantage of him or imposed upon him or practiced any fraud upon him, then the contracts ought to be set aside. Now what ground or allegations of fraud do you allege other than that he was drunk by the act or procurement of the defendant, which you don't sustain? You allege that the land was bought at such a grossly inadequate price as of itself shows fraud. The law is that where one party has a weak mind or is intoxicated, even though it might not be to such a degree that his judgment is impaired to such an extent that he doesn't understand the nature and consequences of his acts, yet if he makes a contract upon a consideration so grossly inadequate as to be of itself a badge of fraud, to be unconscionable, a court of equity will not permit such a contract to stand. That is one of your grounds of fraud that you allege. The allegation is not sustained by the evidence. Another is that Paul Clinton acted as agent for the plaintiff and defendant, in other words, a go-between; that Paul Clinton, without the knowledge of the plaintiff, received from the defendant a commission. Now as to whether or not this property was purchased at a grossly inadequate consideration, I don't so find. There is nothing in this case to impress upon me the truth of the contention that this property was purchased by the defendant Howard at a grossly inadequate consideration. It is true that the testimony of opinion witnesses testifying in this case varies all the way from $5,000.00 to $50,000.00; I believe the highest placed it at $50,000.00 as I recall the testimony; that is, for a one-half interest in the royalty; but the testimony of the witnesses varies exceedingly as naturally always will where you depend upon opinion testimony. Most of the witnesses placed the value around $15,000.00 or $20,000.00. Some of the plaintiff's witnesses place the value at less than the defendant actually paid for it, in their opinion on the value of the property. In other words, some of the witnesses who testified on behalf of the plaintiff gave as their opinion that it was worth less than the actual cash price which the defendant paid for it. Now taking everything into consideration, the fact that at the time there were four wells in the Layton sand producing about 100 barrels a day, may be a little bit more, I believe the testimony showed in October about 100 barrels a day; that in the Wheeler sand there was a gas well. Taking into consideration also the further fact that at the time this first contract was consummated oil was selling at fifty-five cents a barrel, that is, that was the posted price by the large pipe line companies. Taking into consideration the further fact that they were taking only 30 per cent. of the oil; taking into consideration the further fact that a great deal of oil was selling at 30 cents; taking into consideration the further fact that on the day the second contract was entered into the posted price went off to 45 cents a barrel and that they were taking only 30 per cent of it; taking into consideration the further fact that while a great many large Bartlesville wells had been drilled in just east of this property, yet in August, 1914, prior to the consummation of this deal, a

well was drilled 2000 or 3000 feet west of the property, through the Bartlesville sand and through the Tucker sand and it was dry, which, as the witnesses testified here, was an indication of the fact that the reasonable probability was that this property in controversy had no producing Bartlesville sand—it did, however, turn out that there was a small Bartlesvile well come in at 150 barrels which was so much less than the Bartlesville wells just east of the property, some as large as 10,000 barrels,—it was a strong indication that the Bartlesville sand pinched out just east of the property in controversy. I say, taking into consideration all these conditions, I am of the opinion and so find that the price paid by the defendant to the plaintiff, for that portion of the property which the plaintiff sold to the defendant, was fair and reasonable.
* * *

"There is another element which enters into the value of this property: The royalties actually received by the defendant from this property from October 31, 1914, to about February 1st or 8th, 1915, at the time this second deal was consummated, were something like $90.00. I don't remember the exact figures; the testimony will show it was less than $100.00. Now should the second deal be set aside, the defendant required to do equity, that is, pay the balance of the $15,500.00? I think not. What I have said as to the first deal relative to the plaintiff's condition will apply also to the second deal. Now under all the circumstances surrounding that property at the time and the fact that only about $90.00 or $100.00 worth of oil had been sold from that property from October 31st to February 8th, and that the plaintiff was to be paid $15,500.00 in oil, contingent upon its being produced from the property and the fact that the property was then only producing about 100 barrels and on that day a Bartlesville well came in at a flush production of about 150 barrels, and the fact of the price of the oil and that the pipe line companies were only taking a small portion and that it was being sold at a great deal less than the posted price by the great many producers, the possibility of the plaintiff's receiving the entire $15,500 was so uncertain and there was such a contingency connected with it that if he did receive it it would be over such a long period of time, the court cannot find other than that the $5,000.00 paid for that contingent interest which the plaintiff had reserved from the oil to be produced from the land. I say I cannot find other than that was a fair and reasonable consideration for that interest. That the plaintiff at the time of entering into the second contract was in no worse condition mentally than at the first. In other words, I conclude that at the time of entering into both contracts the plaintiff was under no undue influence, and that there was no fraud

or undue influence practiced upon the plaintiff; that the defendant did not seek out the plaintiff to buy the property but that the plaintiff sought out the defendant to sell him the property. I am absolutely unable to see that the fact that the defendant paid to Paul Clinton $2,500.00 to clear this property of Paul Clinton's option is any indication of fraud on the part of the defendant. It occurs to me as natural and reasonable as could be expected from an ordinary and reasonably prudent business man. This property was at the time incumbered by an option recorded, given by the plaintiff to Paul Clinton, in consideration of $100.00, whereby Paul Clinton had an option to purchase this property within a certain time for $30,000. That to all intents and purposes and appearances was a valid and binding option; that is, it appeared to be a cloud upon the title. The defendant, through his attorney, acting as a reasonably prudent man would act, and the attorney acting as a reasonably prudent lawyer would under the circumstances, refused to permit his client to consummate the deal with Miller until the option was cleared from the property. In clearing that option he paid Paul Clinton $2,500.00. It may be, I do not know whether it is so or not, that Ambrose Miller didn't know anything about that, but to my mind that is immaterial. Paul Clinton had a valid subsisting option upon the land so far as the records disclosed; whether that was procured by Paul Clinton or someone else through fraud is immaterial so far as this case is concerned. There is nothing in this case to show that the defendant at any time was ever warned or had any knowledge of any contention that Paul Clinton had procured the option from Ambrose Miller by fraud or undue influence. In fact it is not so contended in this case by the plaintiff himself; and I say the fact that the defendant sought to remove Kimmel's option from the property, sought to remove Paul Clinton's option from the property and to clear the title before he paid any money, does not, to my mind, indicate any fraud or undue influence on his part at all, but is merely consistent with the acts of a reasonably prudent business man under like circumstances. I am unable to conclude from the fact that they executed these deeds at eleven or twelve o'clock at night is any indication of fraud. It is seeking to place an interpretation upon the acts of the defendant and to draw conclusions therefrom which, to my mind, are entirely unjustified by the facts and circumstances surrounding the transaction. It reminds me somewhat of the famous case of Bardell v. Pickwick, wherein the attorney for the plaintiff in quoting Mr. Pickwick's note to Mrs. Bardell, dwelt upon the words 'chops and tomato sauce' and sought to draw the conclusion therefrom that Mr. Pickwick being unduly fond of chops and

tomato sauce, had therefore used these words as words of endearment to Mrs. Bardell, and that therefore he was justified in drawing the conclusion therefrom that there were, no doubt, offers of marriage from Mr. Pickwick to Mrs. Bardell, when in truth and in fact, as we all know, Mr. Pickwick had reference solely to what he wanted for supper. I don't mean to cast any reflections upon counsel. I merely give this as an illustration bearing upon the proposition that the conclusions sought to be drawn from the acts of the defendant surrounding this transaction, are, to my mind, entirely unjustified. I don't see any indication or index of fraud in that circumstance. The fact that these deeds were placed upon record as they were and immediately after being executed, I see no indication of fraud in that. It is a matter of common knowledge that men receiving conveyances of p r o p e r t y, immediately hasten to the register of deeds office and place their muniments of title on record. In fact a man who does otherwise does not show good business judgment. The fact that Dr. Clinton was present that night does not occur to me to be any indication of fraud on the part of Howard or his attorney; the fact that Paul Clinton was there that night does not occur to me to be any indication of fraud or undue influence on the part of Howard or his attorney; the fact that Paul Clinton and Ambrose Miller rode around in an automobile together does not occur to me to be any indication of fraud in this case; and it would be impossible for me to recite all the testimony from which I reach the conclusions I have reached in this case. There is so much of it, and very properly in cases of this kind it is very proper for attorneys to introduce every little circumstance that might bear out their contentions because it is from all the little circumstances in the case that one finally makes up his mind; and I say this whole testimony brings me to the final impression that the deed, so far as O. R. Howard is concerned, was fair, square, open, and above board, that a fair and reasonable consideration was paid for the property; that at the time Ambrose Miller knew what he was doing; that he realized the consequences of his acts; that his judgment was not so impaired that he didn't know he was selling his property; that his memory is now in such condition that he can relate and has related the circumstances of it; and the judgment of the court, therefore, is that the prayer of the petition be denied and judgment will be entered for the defendant."

The trial court also made special findings of fact on certain questions propounded by plaintiff's counsel, which are substantially as follows:

First, that the negotiations whereby the sale was finally consummated were had directly between O. R. Howard and Ambrose Miller, or between Howard's attorney, Mr. Abbott, and Ambrose Miller; second, that the mind of Ambrose Miller had been impaired by reason of the use of strong drink; third, that Ambrose Miller, in making the transfer to Howard, did not receive the true value of his land, but that Miller received "what appeared to men of prudence and skill and having knowledge of the reasonable market value of lands of the same kind and character as the lands in controversy to be the reasonable fair market value of the land at the time the transaction was entered into. By subsequent development and the subsequent increase in the price of oil from 55 cents a barrel to $2.07 the true value of the land at the time is shown to be greatly in excess of the price paid by Howard"; fourth, there has been produced to the one-half interest in controversy the sum of $38,303.48 in royalties up to this time, and the evidence does not show what it is still producing; fifth, Mr. Abbott was the agent and attorney of Mr. Howard; sixth, Ambrose Miller first suggested to Mr. Green, Mr. Howard's brother-in-law, that he desired to sell the property; seventh, that Dr. and Paul Clinton were present when Mr. Howard paid the $500 to Miller and Dr. Clinton stated to Mr. Howard at the time that he was there for the purpose of seeing about getting part of the money that was coming to Paul under the deal; eighth, Dr. Clinton secured a portion of the Ambrose Miller land, but the evidence in this case does not disclose what, if anything, he paid for it; ninth, that Mr. Howard paid Paul Clinton, at the time of the first transaction with Ambrose Miller, the sum of $2,500, which was in part consideration of Paul Clinton's releasing his option on the Ambrose Miller land, and that he paid him $2,000 in pursuance of an agreement entered into at the time of the first transaction with Ambrose Miller, that in consideration of Clinton's release of his option on the Ambrose Miller land that Howard would pay him the sum of $2,500 immediately and an additional $2,000 if when the Bartlett well was drilled in on the land it had a production of more than 100 barrels; tenth, the testimony does not disclose that Ambrose Miller knew of these payments until sometime later.

We have quoted thus fully from the findings of the trial court, for the reason that the evidence is rather voluminous and it is impracticable to discuss it in detail in this opinion. This being an equitable action triable to the court, the court's findings of fact and the judgment will not be disturbed, unless, after weighing all the evidence in the

record, we are of the opinion that such findings and judgment are clearly against the weight of the evidence. Fish v. Schock. 45 Okla. 12, 144 Pac. 584; Crump v. Lanham. 67 Oklahoma, 168 Pac. 43.

Counsel for plaintiffs in error, under the title "Brief of Authorities and Argument," contend that Paul Clinton was the agent of the defendant Howard in procuring the deed from Ambrose Miller to the undivided one-half interest in his allotment; that the said Paul Clinton was also the agent of Ambrose Miller, and received a commission from each party to the transaction; that his agency was well known to Abbott. Howard's attorney, and agent, and that, therefore. Howard is charged with knowledge of the informaton obtained by Abbott. From this premise it is strenuously insisted that the proposition of law that where one acts as agent for both the seller and buyer the contract may be avoided by either principal governs this case. It is clear that this proposition of law is not applicable to this case. Although Paul Clinton received a commission from Ambrose Miller on account of the sale to Howard, the negotiations were carried on directly between Howard and the Millers and the negotiations for clearing the title were carried on between Howard's attorney, Abbott, and the Millers. The evidence also shows that Howard did not know that Paul Clinton was to receive a commission from Miller until after the conclusion of the transactions, and Abbott did not learn of it until after the contract and deed were executed. Moreover, the trial court expressly found that Clinton was not the agent of Howard, and we think this finding is clearly in accord with the weight of the evidence. Mr. Howard, as stated by the court in his findings of fact. in order to clear his title and to secure an undivided one-half interest in the land, free and clear of all liens, purchased the option which Mr. Abbott, his attorney, ascertained from an examination of the title Paul Clinton had on the land.

During the trial of the cause the plaintiff offered in evidence a letter written by Dr. Fred S. Clinton to Dr. J. W. Duke, of Guthrie, Oklahoma, and during his examination Dr. Duke refused to permit the letter to be read in evidence without first having secured Dr. Clinton's consent. and it is urged that the court erred in refusing to permit plaintiffs to introduce this letter in evidence. The record further shows that Dr. Duke later testified as to the substance of the letter and the attorney for plaintiff. during the trial, read a copy of the letter complained of in full, whereupon he asked Dr. Duke if that was the wording of the letter, and received an affirmative reply. From this it is evident that there is no merit in this assignment of error.

Counsel for plaintiffs in error have set out in their brief numerous quotations from the evidence, which they contend show that the court erred in its special findings of fact Nos. 1, 4, 9, 14, 3-13, and 17, but after a careful examination of the evidence set out in the brief, together with the other evidence in the case, we are of the opinion that each and every finding of fact by the trial court is not only not clearly against the weight of the evidence, but, on the other hand, is amply supported by the evidence. The great preponderance of the evidence is that Ambrose Miller was not intoxicated at the time he executed the contract and deed to Mr. Howard. The most serious question in the case is whether by the long use of intoxicating liquors the mind of the plaintiff, Ambrose Miller, had become so diseased and weakened that he did not understand the nature of the transactions and did not know what he was doing, and although the plaintiffs' evidence shows that Miller's mind had become slightly impaired by the excessive use of intoxicating liquors. there is abundant evidence in the record showing, as found by the trial court, that his mind had not become so impaired that he did not fully realize what he was doing and the consequences of his acts.

The authorities are not all in accord as to what degree of intoxication or mental weakness or debility caused from excessive use of intoxicants must be shown in order to rescind a contract made by a person so affected. Some of the cases hold that in order to set aside a contract the drunkenness must be so excessive as to utterly deprive the contracting person of his reason and understanding. Some of the decisions say that it must impair the mental faculties to such an extent as to render the party non compos mentis for the time being. Mr. Black. in his work on Rescission and Cancellation, section 278. says:

"The test approved by the great majority of the decisions is the same which is applied in other forms of mental derangement, namely, that the deed or contract will be voidable if the person, at the time of its execution, was so far under the influence of intoxicants as to be unable to understand the nature and consequences of his act and unable to bring to bear upon the business in hand any degree of intelligent choice and purpose."

Wright v. Waller (Ala.) 54 L. R. A. 440, and cases there cited; Coody v. Coody, 39 Okla. 719, 136 Pac. 754; Fish v. Deaver, 71 Oklahoma, 176 Pac. 251; Loman v. Paulin,. 51 Okla. 294, 152 Pac. 73; Kuhlman v. Wieben (Iowa) 105 N. W. 445; Lee v.. Ware, 1 Hill (S. Car.) 313; Reynolds v.

Dechaums, 24 Tex. 174, 76 Am. Dec. 101; Johns v. Fritchey, 39 Md. 258; Taylor v. Purcell, 60 Ark. 606, 31 S. W. 567; Shackelton v. Sebree, 86 Ill. 616; Watson v. Doyle, 130 Ill. 415, 22 N. E. 613; Pickett v. Sutter. 5 Cal. 412; Wright v. Fisher, 65 Mich. 275, 8 Am. St. Rep. 886, 32 N. W. 605; Harbison v. Lemon, 3 Blackf. 51, 23 Am. Dec. 376; Belcher v. Belcher, 10 Yerg. 121; Waldron v. Angleman, 71 N. J. L. 166, 58 Atl. 568; Wells v. Houston, 23 Tex. Civ. App. 629, 57 S. W. 584.. Measured by the rule enunciated by Mr. Black and the authorities cited, the plaintiffs are not entitled to have the transaction set aside on account of any mental weakness of Ambrose Miller.

Viewed in the light of subsequent developments, it cannot be disputed that the consideration paid by Mr. Howard for the undivided one-half interest in the land was less than its true value, although equal to its speculative value, but the evidence clearly shows that the prospective value of the land was as well known to Miller as it was to Howard, and since there was no actual fraud practiced by Howard upon Miller in procuring the undivided one-half interest in the land we would not be authorized to say that because subsequent development revealed the land to be of great value the transaction should be set aside, especially in view of the hazardous nature of the oil business. It is a well-known fact that land, on account of the discovery of oil on contiguous land, may appear to be of great value and subsequent development prove it to be worthless, while on the other hand contiguous development may indicate the absence of oil or gas and subsequent development prove it to be there in great quantities. This court, in the case of Limerick v. Jefferson Life Ins. Co., 67 Oklahoma, 169 Pac. 1080, in an opinion by Mr. Justice Kane, stated the rule applicable to such transactions as follows:

"The general rule is that whenever property of any kind depends for its value upon a contingency which may never occur, or developments which may never be made, opinion as to its value must necessarily be more or less of a speculative character and no action will lie for its expression, however fallacious it may prove, or whatever the injury a reliance upon it may produce."

It does not appear, however, that Howard made any representations as to the value of the land.

The judgment denying plaintiffs relief. is, therefore, affirmed.

All the Justices concur, except HARRISON, J., absent, and PITCHFORD, J., not participating.