## TINDEL v. WILLIAMS.

No. 29272.   May 14, 1940.

Rehearing Denied June 18, 1940.

Application for Leave to File Second Petition for Rehearing Denied July 2, 1940.

*103 P. 2d 551.*

C. L. Armstrong, of Ponca City, for plaintiff in error.

Williams & Williams and W. W. Potter, all of Ardmore, for defendant in error.

DANNER, J. In October, November, and December of 1935, the plaintiff, George K. Williams, executed to the defendant, Fred R. Tindel, two mineral deeds and a quitclaim deed, conveying all of his 11/45ths interest in 140 acres of valuable oil land. This action to vacate said conveyances is prosecuted by his sister, who was appointed guardian in April of 1938, upon his being declared incompetent. The trial court canceled the deeds, on the grounds of fraud, incompetency, and lack of consideration, and the defendant appeals. The contention is that the judgment is against the weight of the evidence.

The plaintiff, a mixed-blood Chickasaw Indian, lived at Ardmore, Okla. In 1932 and 1933, when he was approximately 27 years of age, he came into $37,000 in cash, in addition to his interest in the oil producing royalty mentioned above. He began drinking heavily. He was not at that time acquainted with defendant, but in the latter part of 1932 he met defendant's half sister and began living with her, later marrying her in 1933. After the marriage he met the defendant, who for a livelihood was selling whisky in a small home in Ponca City. Plaintiff began patronizing defendant's business, and said business almost immediately prospered greatly. It was not long until the defendant purchased an elaborate night club east of Ponca City, including facilities for dining, dancing, and gambling, and a bar at which whisky, champagne, and mixed drinks were served. The establishment also contained separate living quarters for the family, wherein plaintiff and sometimes his wife took up their abode for periods of varying duration, although during the ensuing two years plaintiff frequently visited and remained for a while in Ardmore, Oklahoma City, and other places.

The defendant's place of business and living quarters seem, however, to have attracted the chief interest of plaintiff. As time went on, his prodigalities and drinking increased and his fortune diminished, so that by the summer of 1935 his $37,000 cash was gone, and by October of 1935 he had conveyed his mineral interests to defendant. In 1936 he was arrested for robbery with firearms and was convicted and sent to the penitentiary at McAlester. Conversely, the defendant in the meantime gradually prospered, from a very modest bootlegging business, in the beginning, to ownership and management of a remunerative night club, and from that into the oil business.

While the plaintiff by no means spent all of his money and time at defendant's establishment, the evidence was sufficient to warrant belief that a substantial part of it was, and that defendant and the nature of his business contributed largely to plaintiff's delinquency. According to the testimony of several witnesses, plaintiff was very drunk and gambling at defendant's place at all times observed by them, and lost much money in that manner. No record exists as to the actual amount which plaintiff drew out of the bank by check while he was in Ponca City, but the following amounts were shown to have been telegraphed him from Ardmore at

his request: On August 25, 1934, $500; September 15, 1934, $300; December 17, 1934, $1,000; December 18, 1934, $1,000; December 24, 1934, $1,000; January 19, 1935, $1,000. Also, on August 25, 1934, the date shown above on which $500 was wired him from Ardmore, plaintiff gave defendant a check for $750, which was cashed, making the traceable amount on that particular date $1,250. The thousand dollars per day, noticeable on December 17th and 18th, followed by another thousand in six days, and another thousand shortly afterward, is significant. On several, if not all, of the above telegraphic money orders, the defendant identified plaintiff in order to enable him to receive the money.

Without detailed narration of the testimony of the various witnesses, it is sufficient to say that the plaintiff, apparently not of overstrong intelligence to start with, simply staged a two- or three-year chronic drunk of surprising intensity and constancy, with the result that his mind progressively deteriorated. That is the ultimate fact of legal importance, and though perhaps some of the events and episodes transpiring during that period would make interesting reading, their recitation is unnecessary. In addition to the lay witnesses, from Ardmore, Ponca City, and other places, one medical expert (who did not know plaintiff and had not examined him, however) testified, in answer to a hypothetical question, that under the circumstances delineated therein the plaintiff would not have been competent "to transact business during that time," meaning a period of time including the dates of the conveyances.

The case is not so simple, however, from a legal viewpoint, as the foregoing may seem to indicate. The defendant produced five disinterested witnesses who testified that they observed and talked with plaintiff on the dates and at the places of execution of the conveyances in October, November, and December, 1935; that he was sober and apparently normal and capable of understanding; that he did not even appear nervous or jittery. Said witnesses were the notaries public and others in the abstract offices where the instruments were executed, and in the office of the county clerk where the deeds were recorded. One of said notaries had also met and conversed with plaintiff on the street shortly prior to execution of one of the instruments.

From the foregoing paragraph it is apparent that if the reasoning employed herein should parallel the rules relating to the execution of wills by insane persons during lucid intervals, we might arrive at a different result. According to the weight of authority, however, a somewhat different application of the rule is made in cases where the grantee in a habitual drunkard's deed is one who helped bring about that condition in the grantor, and especially is this true where inadequacy of consideration is added. Careful analysis of such cases reveals, we believe, that the courts in such instances do not predicate their rulings so much on actual disqualifying incompetency of the grantor as they do on a form of estoppel of the grantee, or fraud. More will be said of that later; for the present we approach the problem from the broader aspect of the rules in general affecting incompetency produced by drunkenness, so that upon reaching the particular point it may be discussed more understandingly.

In cases involving cancellation of deeds for incompetency the question of adequacy of consideration, though not necessarily controlling, is important. This is particularly true where the element of overreaching enters into the case because of other and additional reasons. The two questions, that of competency and that of adequacy of consideration, are so interrelated in such cases that they are best discussed together, rather than separately. In the instant case there is plausible argument that a fair adjustment of the financial dealings between the parties would indicate a total lack of consideration, but we need not enter into that. Accepting everything contended for by defendant as true, for the purpose of reasoning, the amounts which he says from time to time were ad-

vanced to plaintiff would probably not exceed $3,000, while the trial court was authorized to believe that the value of the interest conveyed was in excess of $30,000. A difference of a few thousand dollars either way would not necessarily change the result; we think the finding of a lack of consideration is sustainable at least to the extent of gross inadequacy, which is sufficient under the facts of the particular case before us, there being the additional element of encouraged drunkenness present, as related above.

A deed, executed by a person unable to know the nature or circumstances of his act, though his incompetency be produced by intoxication, is voidable, and said deed may be canceled by himself, although the intoxication was voluntary and not produced by the circumvention of the other party. Coody v. Coody, 39 Okla. 719, 136 P. 754, L. R. A. 1915E, 465. It is not, of course, the mere fact of being drunk which avoids the deed. It is the incompetency itself, as that phrase is defined by the law, which is the determining feature. It is the state and condition of the mind that the law regards and not the causes that produced it. If from any cause his reason has been dethroned, his disability to contract is complete. So, as stated, the mere fact that one is drunk when he enters into a contract is no ground for setting it aside, unless the drunkenness deprives the party of his reasoning and of an agreeing mind, or unless the drunkenness was brought about by the opposite party, who took advantage of it.

The cases divide themselves roughly into three classes: (1) Where contracts are executed while in a state of actual intoxication of sufficient degree to impair the reason; (2) where the contract is executed by a habitual drunkard, in which case the question frequently reduces itself to a consideration of whether a permanent or semi-permanent impairment of mind has resulted, regardless of actual intoxication at the time; and (3) where the grantee encourages the grantor to drink, either habitually or otherwise, and obtains a deed from said grantor under circumstances connected with the drinking. In the third class of cases (and especially in cases which fall within both the second and third classes), it is usually found that the courts do not require proof of as great a degree of incapacity as they require in the other cases. An excellent annotation may be found on this whole question in 6 A. L. R. 331.

A habitual drunkard is not incompetent as a matter of law. As a general rule, a deed made by him during a sober interval is binding, but where his mind has become so impaired by habitual intoxication that he cannot act with an "agreeing mind," it is voidable, and although he made the deed in a sober interval, it is invalid where there is a showing that he was overreached. 6 A. L. R. 337, 341.

Harlow v. Kingston, 169 Wis. 521, 173 N. W. 308, 6 A. L. R. 327, in which the deed in question was canceled by the court, had two of the elements of the present case, but not the third, in that the drunkenness was not induced or encouraged by the grantee. Quoting: "Plaintiff had been on a prolonged spree and had been grossly intoxicated, although at the time of the making of the deed he was sober; that he had been out of money for several days and had exhausted his credit. * * * That while the plaintiff was not appreciably under the influence of liquor at the time of the sale, nevertheless, by reason of his debauch, he had such a consuming thirst for liquor and his mind was so dominated thereby that it did not act normally and he did not appreciate what he was doing. * * * That the price paid was grossly inadequate and the transaction unconscionable."

The following excerpt from the opinion is framed in language probably too broad, but it illustrates the tendency of the courts in such cases:

"When an unconscionable bargain has resulted from conditions due to intoxication and debauchery, equity considers the transaction an imposition on the incompetent party and awards relief."

We have not found any Oklahoma decisions squarely in point with the instant case on the fact situation. In the Coody Case, supra, the deed was canceled because of actual intoxication coincident with its execution. In Parker v. Parker, 75 Okla. 234, 182 P. 697, 11 A. L. R. 720, the deed was canceled because of habitual intoxication resulting in weak-mindedness, there being no evidence of intoxication at all when the deed was executed, the court holding that by reason of the existence of a confidential relation between the grantor and grantee the burden was upon the grantee to show that the transaction was fairly conducted, which burden the grantee, through the failure to produce evidence, had not met. Byrd v. McKoy, 183 Okla. 209, 81 P. 2d 315, involved a habitual drunkard, and it was held that the judgment of the trial court refusing to cancel the deed was not clearly against the weight of the evidence, but in that case it was shown by affirmative evidence that the grantor was in fact sober and thoroughly understood what he was doing and desired to complete the transaction. Furthermore, there was no overreaching, no plying with liquor, no inadequacy of consideration. See, also, the following: Miller v. Kimmel, 76 Okla. 233, 184 P. 762; Miller v. Howard, 76 Okla. 237, 184 P. 773. In the latter case the deed was held valid because the evidence indicated that the grantor was not intoxicated when the deed was executed. But the court said:

"The most serious question in the case is whether by the long use of intoxicating liquors the mind of the plaintiff * * * had become so diseased and weakened that he did not understand the nature of the transaction, and did not know what he was doing, and although the plaintiff's evidence shows that Miller's mind had become slightly impaired by the excessive use of intoxicating liquors, there is abundant evidence in the record showing, as found by the trial court, that his mind had not become so impaired that he did not fully realize what he was doing and the consequences of his acts."

As noticed above, we have here the combination of several elements, not all of which were present in any decision of this court considering like questions, so far as we have been able to find. Here there are (1) habitual drunkenness; (2) the furnishing of liquor by the grantee, in considerable amounts and over a considerable period of time; (3) gross inadequacy of consideration; (4) the long-range opinion testimony of one expert (who had never examined plaintiff) hypothetically given, that under the circumstances the plaintiff would not have been competent on or near the dates of execution. (We do not attach great importance to number 4; neither, apparently, did the trial judge.) Let us now sketch the results of a few cases including some of those elements.

Kendall, Adm'r of Estate of Redeagle, v. Ewert, 259 U. S. 139, 66 L. Ed. 862, originated in the District Court of the United States for the Eastern District of Oklahoma. There were present the elements of habitual drunkenness and "overreaching," both in the matter of consideration and in the means employed to obtain execution of the instrument, which was a dismissal of an action affecting title to realty. The Supreme Court of the United States reversed a decree of the Circuit Court of Appeals which had dismissed the action to vacate the instrument, and held that said instrument should be canceled. We quote the 4th syllabus and a portion of the opinion:

"Evidence of competency, entirely clear, should be required to sustain a transaction in which a common habitual drunkard has been overreached by a competent and aggressive person. * * *

"Without further discussion of the evidence, it is sufficient to say that, while the witnesses differ as to whether Redeagle had deteriorated to the point of being incompetent to do business when temporarily sober, they all agree, and the district judge agrees with them, that, long before the stipulation for dismissal was signed, he had come to be generally regarded as a common, an habitual, drunkard, and we think the circuit court of appeals failed to give the weight to this fact which it deserves. That habitual drunkards are not competent to prop-

erly transact business is so widely recognized in the law that in many states statutes provide for placing them under a guardian or committee, with authority to put restraint upon them and to preserve their property, not less for themselves than for those dependent upon them. * * *

"The extent to which one must have fallen below the standard of ordinary business capacity before he will be generally recognized in a community as a common drunkard is so notorious that we do not hesitate to say that evidence of competency entirely clear should be required to sustain a transaction in which such a person has plainly, as in this case, been overreached by a person dealing with him who is competent and aggressive. Men so reduced will sacrifice their property, as they have sacrificed themselves, to the craving for strong drink; and Ewert's letters show that he knew perfectly well that the Indian with whom he was dealing had reached that unfortunate stage of decay."

The court then pointed out that the difference between the consideration and the actual value of the property involved, was "most persuasive evidence of the condition of incapacity of Redeagle at the time the stipulation was obtained from him, even though he may have been temporarily sober when he signed the paper."

In Miller v. Sterringer, 66 W. Va. 169, 66 S. E. 228, 25 L.R.A. (N. S.) 596, the grantor was to a certain extent an imbecile from constant use of intoxicants and was but slightly intoxicated when the deed was made. The grantee was a saloon keeper with knowledge of the grantor's weakness, at whose place the grantor had been in the habit of purchasing most of his liquor. The property deeded to the grantee for $500, on time and without interest, had been purchased by grantor, only two months before, for $700. It was held that the deed was invalid, and that under the circumstances it was not necessary that the grantor be totally incapacitated by liquor in order to set aside the deed. The court cited many authorities in support of the principle that equity will relieve one from a contract made by him in drunkenness, though his reason may not have been wholly overthrown, where fraudulent advantage has been taken, or where the drunkenness has been brought about by the other party, quoting particularly the case of Calloway v. Witherspoon, 40 N. C. 128, basing the doctrine not on the ground of drunkenness but of fraud. The West Virginia court also quoted from a Canadian case peculiarly akin to the instant one in facts, McGregor v. Boulton, 12 Grant, Ch. (U. C.) 288, as follows:

"It is manifest that a man of intemperate habits, a slave to strong drink, when dealing with the tavern keeper at whose house he lives, and from whom he obtains the liquor which he craves, and with which he daily stupefies or maddens himself, is as liable to be overreached, and needs for himself and his family or heirs the protection of this court at least as much as a client who deals with his solicitor, or as a patient who has transactions with his medical attendant. No man is more helpless than a drunkard is in the hands of those who obtain his confidence, and to whom he looks day by day for the gratification of the morbid craving which has possessed him; and the modern doctrine of both law and equity is against giving up even a poor drunkard, or a drunkard's property, to be the prey of the rapacious and unprincipled."

In Clarkson v. Kitson, 4 Grant, Ch. (U. C.) 244, the grantor, a habitual drunkard, conveyed property for an inadequate consideration to the keeper of a tavern in which grantor was living. The grantee had supplied him with liquor at different times, and though there was no proof that the grantee had induced him to become intoxicated at the time the deed was executed, the deed was set aside by the grantor's heirs.

In Jones v. McGruder, 87 Va. 360, 12 S. E. 792, a habitual drunkard's deed to a grantee who had previously led him into intoxication, but not on that occasion, was set aside.

Judicial notice appears to have been resorted to, in the following language from Menkins v. Lightner, 18 Ill. 282,

involving habitual drunkenness and an inadequate consideration, although it was shown that the grantor supposedly was "sober" when the deed was executed:

"After the defendant had established so long a continuous career of drunkenness, and craziness from it, as has been proven here, it is not enough or satisfactory to show a mere sober interval of a few hours, or even a few days. I am not prepared to believe that the mind can so resume a healthy vigor after so much and so long derangement from such besotted habits. * * * When the mind is thus broken down by a long course of dissipation, the feverish moments of a half sober or even sober interval cannot be called * * * a lucid interval, for the purpose of establishing the acts of the party. To lay down such a rule would be to invite the covetous and the crafty to seize the victim in an interval of his greatest physical agony and prostration as the one in which the mind alone is clear, free and judicious. All observation contradicts the inference of so instantaneous a mental recovery."

The foregoing is remindful of plaintiff's testimony in the present case, wherein, after describing instances where he would imagine he saw horses or elephants standing in the road ahead of the automobile driven by him, causing him to stop the car, he stated that such phenomena occurred every time he tried to sober up.

Adams v. Ryerson, 6 N. J. Eq. 328, involved a situation where the grantor, a habitual drunkard, gave a deed to the grantee, a liquor seller from whom he was accustomed to buy liquor, for little or no consideration. The deed was cancelled by the court. See, also, the following: Guidici v. Guidici, 2 Cal. 2d 497, 41 P. 2d 932; More v. More, 136 Cal. 489, 65 P. 1044, 66 P. 76; Lavette v. Sage, 29 Conn. 577; Cruise v. Christopher, 5 Dana (Ky.) 181; Rutherford v. Ruff, 4 S. C. Eq. 350, 4 Desaus. 350. The following language from Hume v. Cook, 16 Grant, Ch. (U. C.) 84, has frequently been quoted in the decisions of the various courts:

"The case is very strong against such a transaction where the grantee is a tavern keeper who was dealing with a drinking lodger. I understand the rule of equity to be that a conveyance by an intemperate man of all his property, to the tavern keeper with whom he lives and at whose house he had been supplied with the drink which he prefers to all earthly objects of desire and to all hope of future happiness, is subject to the same rules as a conveyance to a person occupying toward the grantor a relation of confidence or influence. The danger, in consequence of which those rules have been laid down, exists in a much larger degree in the former case than in the latter, and needs to be guarded against with greater caution."

For more recent decisions see the annotation in 36 A.L.R. 619, and American Digest System, "Deeds," Key Numbers 68(5), 196(1) and 211(1), and "Contracts," Key Number 92.

The fraud which was found by the trial court to have been perpetrated consisted of the taking of the deeds by the grantee, under the circumstances herein delineated, for no consideration or a grossly inadequate consideration. In other words, that contributing toward the production of incompetency in another, and, with knowledge of such incompetency, accepting a deed for an inadequate consideration, is sufficient to constitute fraud. Such is the generally accepted rule.

The test of affirmance or reversal in an action of this kind is not whether the judgment is against the "clear weight" of the evidence, as that expression is sometimes inadvertently used, but whether same is *clearly against the weight* of the evidence. In the light of the foregoing authorities, with which we agree in the main, we are of the opinion that the judgment is not clearly against the weight of the evidence. The judgment is affirmed, and the motion of plaintiff for judgment on the supersedeas bond, covering that portion of the judgment for the amount of oil and gas royalties received by defendant from the time of his assumption of possession of

the land until the filing of suit, is sustained.

BAYLESS, C. J., WELCH, V. C. J., and OSBORN and DAVISON, JJ., concur.